BANKS, Plaintiff in error, v. STATE, Defendant in error.

*No. State 33. Argued April 1, 1971.—Decided May 7, 1971.*
(Also reported in 186 N. W. 2d 250.)

146

For the plaintiff in error there were briefs by *Niebler & Niebler,* attorneys, and *George N. Kotsonis* of counsel, all of Menomonee Falls, and oral argument by *Mr. Kotsonis.*

For the defendant in error the cause was argued by *Robert D. Martinson,* assistant attorney general, with whom on the brief were *Robert W. Warren,* attorney general, *William A. Platz,* assistant attorney general, and *E. Michael McCann,* district attorney of Milwaukee county.

BEILFUSS, J.   The defendant's principal contention is that he should be relieved from criminal responsibility of the act charged because he was exercising a statutory privilege of self-defense.  This contention divides itself into two issues:

(1) Whether, as a matter of law, defendant acted in self-defense.

(2) Whether the defendant should be granted a new trial in the interest of justice.

The self-defense statutes provide, in part, as follows:

"939.48 **Self-defense and defense of others.** (1) A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what he reasonably believes to be an unlawful interference with his person by such other person. The actor may intentionally use only such force or threat thereof as he reasonably believes is necessary to prevent or terminate the interference. He may not intentionally use force which is intended or likely to cause death or great bodily harm unless he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself.

"(2) Provocation affects the privilege of self-defense as follows:

"(a) A person who engages in unlawful conduct of a type likely to provoke others to attack him and thereby does provoke an attack is not entitled to claim the privilege of self-defense against such attack, except when the attack which ensues is of a type causing him to reasonably believe that he is in imminent danger of death or great bodily harm. In such a case, he is privileged to act in self-defense, but he is not privileged to resort to the use of force intended or likely to cause death to his assailant unless he reasonably believes he has exhausted every other reasonable means to escape from or otherwise avoid death or great bodily harm at the hands of his assailant.

"(b) The privilege lost by provocation may be regained if the actor in good faith withdraws from the fight and gives adequate notice thereof to his assailant."

The charge of endangering safety by conduct regardless of life upon which the defendant Banks was convicted arose out of a shooting incident on March 15, 1969, in a tavern known as Kyles Corner in the city of Milwaukee. The owner, Leroy Kyles, was shot and

wounded. It is undisputed that on that date, at about 10 p. m., Banks went behind the bar at the tavern and demanded money from Kyles at gunpoint. Kyles removed some money from his pocket and gave it to Banks. After a bill fell on the floor defendant struck Kyles on the head with the gun he was carrying and proceeded to walk toward the front door of the tavern. Banks claims that as he reached the door Kyles came out from behind the bar and began shooting at him and that he returned Kyles' fire in self-defense. Kyles, on the other hand, claims that he was never armed and fired no shots at defendant, but that the defendant simply turned and began shooting as he was leaving. In addition, the evidence is in conflict as to precisely what took place behind the bar and the events which led up to it.

Leroy Kyles testified that the defendant Banks came behind the bar armed with a gun and asked for all of his money, not specifically for $40. He reached into his pocket and pulled out four ten dollar bills which he gave to the defendant. One of them dropped on the floor and Banks told him to pick it up. He refused and Banks struck him on the head with his gun. He picked up the bill and handed it to the defendant who then turned and started toward the door. Kyles stated that he walked out from behind the bar and said, "Okay, buddy, you won't get far." When he said this Banks was about 17 feet away from him and he whirled around and started firing. Kyles turned over a table and got behind it for protection. Kyles also stated that he had worked at the tavern from 8:15 a. m. to 3 p. m. on that date, but that he did not see Banks at all that day until the time of this incident. He admitted having a gun in a drawer behind the bar, but stated that he did not take it out of the drawer that night.

The state's second witness was Jerry Cooper, Jr., a bartender who had begun work that afternoon at 3 p. m.

He stated that Banks had come into the tavern twice during the afternoon looking for Kyles and one Junior Nichols. At about 10 p. m., he saw Banks approach Kyles behind the bar and they began arguing over some money. The defendant told Kyles to give him some money, and when he asked how much Banks responded, "$40." Kyles pulled some money out of his pocket and dropped some on the floor. He told Banks to pick it up and Banks told him to pick it up. Banks then struck Kyles on the head with his gun and at this point Cooper jumped over the bar and ran out the door because he could not stand the excitement. After he got outside he heard a series of shots but did not see who fired them. He stated that the argument between Banks and Kyles occurred at the opposite end of the bar from the drawer in which Kyles kept his gun, and that Kyles could not pass the drawer on his way out from behind the bar. He also stated that he had seen Banks' check in the cash register that day and that he might have seen him and Kyles together in the tavern earlier in the day.

The state's third witness, Frank Nichols, testified that he was in the back room of the tavern shooting pool when Banks came up to him, put a gun in his stomach and said, "Give me what you got." When he answered that he had nothing defendant took six or seven dollars from his pocket. Banks then went out to the front and Nichols went as far as the door. He heard the defendant Banks ask Kyles about $40 and Kyles removed some money from his pocket. Kyles dropped some of the money on the floor and the defendant then struck him on the head with his pistol. When this happened Nichols moved back into the poolroom and then heard some shots but could not see who was doing the shooting. He denied that he owned or was carrying a gun that night.

The defense called four witnesses in addition to the defendant himself. The first witness, Anthony Vallone,

testified that he was a patron in the tavern and that the first time he saw Kyles that night he was standing at the curve in the bar firing a long silver revolver toward the door. He stated that Kyles definitely fired the first shot, and then a series of shots were fired back and forth between Kyles and the person in the doorway. He crouched down under a chair during this exchange of fire and could not see the doorway because of a partition between it and the table at which he had been sitting. He was wounded in the arm by one of the shots.

The second defense witness, Howard Evans, testified that the first shot was fired by Kyles as he was standing between the curve in the bar and the door. He stated that Kyles fired at the defendant's back as he walked out the door. As he was trying to get out of the way, Evans heard several more shots fired and saw Kyles fall over a table which in turn fell on Evans himself. Evans was wounded in both legs during the shooting.

The third defense witness, Beatrice McCants, testified that she saw the defendant come out of the back room and go behind the bar, put a gun in Kyles' side and ask him for his money. When Kyles asked how much, the defendant responded, "$40." As Kyles was giving him the money some of it fell and Kyles picked it up. Banks struck Kyles on the head with his gun and then proceeded to walk to the door. When he reached the door Kyles stood by the side of the bar and started shooting at his back. Banks turned around and started firing back. In an attempt to get closer to the defendant Kyles used a table and Anthony Vallone as shields. She remained at the bar until her brother, Howard Evans, was shot and then she went to him.

The fourth defense witness, Vesta Mason, who was sitting with Mrs. McCants, related the same story with the exception that she backed up against a wall during the shooting.

The defendant Banks also testified in his own behalf. He stated that on March 15, 1969, the date of this incident, he had gone to Kyles Corner at approximately 9:30 a. m., and had Kyles cash his income tax check. He then got involved in a dice game in the back room with Frank Nichols and several other men. The game ended in a fight between Banks and Kyles and one of Kyles' friends. After leaving the tavern he discovered that all of his money was missing. He got his gun and went back to the tavern several times during the day looking for Kyles. He returned to the tavern at approximately 10 p. m., and approached Nichols in the back room, where he disarmed him. Nichols told him that Kyles and another man had taken his money that morning.

Banks then proceeded behind the bar with his gun drawn and asked Kyles for his $40. Kyles gave him four ten dollar bills, and when one fell on the floor he told Kyles to pick it up, which he did. As he turned to leave Kyles said that he and his brother were going to get him for this. Banks then struck Kyles on the head with his gun and started to walk out of the tavern. As he reached the door and was opening it he heard a shot, and as he turned around and drew his gun out of his pocket he saw Kyles standing about 18 to 20 feet away from him. Kyles turned over a table and fired three more shots at him. Banks fired two shots back at Kyles and backed out the door. Kyles fired another shot and the defendant fired two more, striking Kyles with one. Kyles then fell over the table where Evans and Vallone were sitting and the defendant heard two more shots go off.

The state also called Milwaukee Police Detective Vincent Partipilo, who had questioned Banks at the police station on the night of this incident. The statement which Banks gave to Detective Partipilo was substantially the same as his testimony at the trial, with the exception that at the time Banks did not recall how many

shots he had fired and did not know whether he had hit anyone.

Banks does not dispute the fact that he was the initial aggressor and therefore had lost the privilege of self-defense, but argues that the record establishes as a matter of law that he had withdrawn from the conflict and therefore his privilege was regained. This argument is based upon the premise that there is no real dispute concerning the credible evidence adduced at trial, and that it establishes his version of the facts beyond any doubt, reasonable or otherwise. To adopt this premise this court would have to find as a matter of law that Kyles' testimony is inherently and patently incredible and therefore must be disregarded.

The decisions of this court *ad infinitum* all hold that the determination of witnesses' credibility and the weight to be accorded conflicting testimony are properly a function of the trier of fact. But at the same time it has stated this rule the court has also indicated that there may be circumstances where the testimony given by a witness renders him unworthy of belief as a matter of law, in which case it can substitute its judgment for that of the fact finder if such testimony has been relied upon. *Embry v. State* (1970), 46 Wis. 2d 151, 174 N. W. 2d 521; *Gauthier v. State* (1965), 28 Wis. 2d 412, 137 N. W. 2d 101.

Kyles' testimony in this case is clearly inconsistent with that of defendant and the four witnesses called by the defense. In addition, the crucial element of his testimony, *i.e.*, that he did not shoot at defendant as he was leaving the tavern, is not corroborated by any of the other state's witnesses. However, the mere fact of numbers is not in and of itself sufficient to render the testimony of a witness inherently incredible. Looking at Kyles' testimony alone, it is not controverted by any physical evidence or facts of definite certainty. It is possible that the incident could have occurred just as Kyles said it did.

Therefore, this court cannot disregard Kyles' testimony and hold as a matter of law that the defendant acted in self-defense. The evidence presented at the trial was in conflict, but none of it was inherently or patently incredible. The determination of its weight and credibility was properly for the trial court.

However, a resolution of defendant's first issue does not dispose of this case. There is at least one, and possibly a second factual question which must necessarily have been decided by the court in order for the judgment of conviction to be sustained. First, the trial court must have determined whether or not Kyles fired the first shot at defendant. If it found that he did, as the great weight of the testimony seems to indicate, then the court must have determined whether the defendant, the initial aggressor, regained the privilege of acting in self-defense by withdrawing from the conflict and giving adequate notice to Kyles.

Prior to finding defendant guilty, the trial court stated:

"Well, gentlemen, having in mind the kind of instructions I would give to a jury if this were tried before a jury, insofar as legal issues involved are concerned, I, of course, would instruct the pleading on the law of self-defense—the privilege of self-defense and, particularly, also, with respect to the factual situation—one who provokes an assault, and his rights under the circumstances.

"And, applying that law to the factual situation here, I do not believe and I cannot give the defendant the benefit of any reasonable doubt, because I do not have any—that this defendant was entitled to exercise the right to self-defense, *he himself having provoked the initial assault—provoked any attack that may have ensued thereafter, which would be a jury question.*

"But, as I assess credibility under the total factual situation exposed here, and there is some conflict of evidence—my resolution is that the facts here, as I interpret credibility, do not justify the exercise of the privilege

of self-defense on the part of the defendant here. *He came in there determined, bent upon retrieving what considered to have been deprivation of his money illegally, and he attempted to regain it, he wanted to recoup his money—he went about it the wrong way, of course, going into those premises, with two guns finally in his possession. He came in with one.*

"The bullet struck a very vital spot in the victim. And, having heard this evidence, and it has been somewhat interposed from a partisan standpoint of the respective parties, but, interpreting credibility as I do, I do not find that the facts justify the exercise of the privilege of self-defense, and I have no reasonable doubt concerning the same. And, consequently, I find the defendant, Ernest Banks, guilty of the offense charged in the information. Will he step forward?" (Emphasis supplied.)

It is not clear that the trial court determined who fired the first shot. Although the trial court mentions a conflict in the evidence and states that it has assessed the credibility of the testimony in the total factual context, it gives no indication as to whether it has accepted Kyles' version of the facts or that of the other witnesses. From the first italicized comment it appears just as reasonable to assume that it found that Kyles shot first as it would be to assume that it reached a contrary finding. Rather, the court's language raises the inference that it denied the application of self-defense solely because defendant had provoked the confrontation by resorting to a violent means of attempting to recover what he claimed had been stolen from him, regardless of whether or not Kyles had opened fire on him. And because it was so influenced by the fact that the defendant was the initial aggressor, it does not appear that the court gave full consideration to the question of whether defendant might have regained his privilege by withdrawing.

Our legislature has provided (sec. 939.48 (2) (b), Stats.) an aggressor may regain the privilege lost by

provocation. The rule is further amplified in Miller, *Criminal Law* (hornbook series), pp. 207, 208, sec. 67 (g), which states:

"As has been previously stated, self-defense is not available as a plea in excuse or justification, to one who was himself the aggressor in the difficulty which resulted in death or other injury. If, however, after bringing on the difficulty, such a person withdraws, in good faith, and shows his adversary that he does not desire to continue the conflict, but his adversary thereupon pursues him and becomes the aggressor, he has the same right to defend himself as if he had not originally provoked the difficulty. . . . If he withdraws and gives his adversary reasonable ground for believing that he has withdrawn, it is sufficient. It is not required of him that he, at all hazards, make it actually known to his antagonist that he has withdrawn; if his acts are such as would notify a reasonable man under the circumstances of the withdrawal, that is all that is required of him. If the passion or cowardice of the adversary blind him to the actions of the accused showing his intention to withdraw, this cannot be charged against the accused, so as to deprive him of the right secured by his withdrawal to defend his life. 'If the party assailed has eyes to see he must see, and if he has ears to hear he must hear. He has no right to close his eyes or deaden his ears.' . . ." *Also:* 1 Wharton's, *Criminal Law* (12th ed.), p. 831, sec. 615.

Assuming that Kyles did fire the first shot, he would not have been justified in so doing because defendant had been engaged in unlawful conduct. *See* sec. 939.49, Stats.; 1 Wharton's, *Criminal Law* (12th ed.), p. 184, sec. 132. Nor would the fact that defendant was fleeing from the scene of his unlawful act have prevented him from regaining the privilege.

Few cases can be found dealing with the regaining of the privilege of self-defense by an aggressor. The closest case in point is *Holmes v. State* (1905), 124 Wis. 133, 102 N. W. 321, cited by the defendant. In reviewing the facts of that case the court stated, at pages 135, 136:

"For some time before the occurrence in question the feeling between *Holmes* and the Walter boys was so bitterly hostile that the former knew his presence at the brewery property was liable to lead to a breach of the peace. He made threats of personal violence to the Walter boys, the bookkeeper at the plant, A. J. Schmidt, and the trustee of the property, Christian Walter. He visited the property on the day in question armed with a revolver secreted about his person. He entered the boiler room where George was working, and was immediately ordered to leave. He refused to go, whereupon George caused Martin to be sent for, who speedily arrived, and the two assaulted *Holmes,* treating him quite roughly by pulling him down upon the boiler room floor and striking and choking him. The assault lasted some little time without any serious injury to *Holmes* being produced, when he was finally ejected from the room. The boys followed him outside thereof, continuing to admonish him to leave and keep away from the premises. He indicated a willingness to comply and apparently started to do so, whereupon George turned to go back to his work. The movements of the two placed George nearly with his back towards *Holmes,* who quickly drew his revolver and shot George in the back, the course of the bullet as it entered the body being towards a vital part. George fell forward when the bullet struck him and *Holmes* immediately turned his weapon in the direction of Martin and fired at him. He used language when the shooting commenced and immediately thereafter indicating that his intention was to use the revolver with fatal effect."

Holmes attempted to argue that his shooting of George Walter was in self-defense. In rejecting this contention the court stated, at pages 137, 138:

". . . There is ample evidence in the record showing that after the affray in the boiler room the accused went therefrom and was free to go from the premises undisturbed; that he knew the Walter boys and their associates supposed that he had fully submitted to their insistence that he should leave the premises, and presently, at least, he was not in danger of being interfered with, unless he invited it; that George so regarded the

situation and turned to go back to his work, while *Holmes* started, seemingly to leave the grounds, but took such a direction as to place himself near to and in the rear of George, as related in the statement, when he suddenly drew his revolver and shot George, accompanying his act by expressions strongly suggesting a premediated design to kill. . . ."

In this case Leroy Kyles was the only witness who testified that he was unarmed and did not shoot at defendant's back as he was leaving the tavern. Even Kyles testified that Banks' back was turned and he was at the door when the shooting started. The state's two other witnesses both had left the barroom before the shooting began, and neither one knew whether Kyles had fired any shots. The four witnesses called by the defense all unequivocally testified that Banks had turned his back and walked toward the door and was opening or had reached the door when Kyles shot at him, and that this was the first shot. These were four disinterested witnesses, two of whom received gunshot wounds as a result of the incident.

Since none of the testimony in the record is inherently incredible, if it were clear that all of the factual issues had been considered and resolved at the trial they could not be reargued here. *Tobar v. State* (1966), 32 Wis. 2d 398, 145 N. W. 2d 782. But as indicated above, the trial court's comments make it questionable whether it decided to believe or disbelieve Kyles' testimony. Assuming it might have believed that Kyles did in fact shoot at the defendant, then it appears that the court considered such act provoked, and did not consider the factual question of the defendant's withdrawal.

In *Schwamb v. State* (1970), 46 Wis. 2d 1, 10, 173 N. W. 2d 666, the court once again set forth the rules governing the exercise of its discretion in granting a new trial in the interest of justice pursuant to sec. 251.09,

Stats., citing *Commodore v. State* (1967), 33 Wis. 2d 373, 383, 147 N. W. 2d 283. It said:

" 'This power is exercised with "some reluctance and with great caution" and only in the event of a probable miscarriage of justice. *Ferry v. State* (1954), 266 Wis. 508, 511, 63 N. W. (2d) 741. Such grave doubt must exist regarding a defendant's guilt to induce the belief that justice has miscarried. *State v. Fricke* (1934), 215 Wis. 661, 667, 255 N. W. 724. In *Lock v. State* (1966), 31 Wis. (2d) 110, 118, 142 N. W. (2d) 183, we stated:

" ' "In order for this court to exercise its discretion and for such a probability [of a miscarriage of justice] to exist we would at least have to be convinced that the defendant should not have been found guilty and that justice demands the defendant be given another trial." '

"In *Commodore* we also indicated, for there to be a new trial on this ground, that there must be evidence to indicate that a different result would be obtained under optimum circumstances. *Commodore, supra,* page 383."

Certainly the defendant Banks was the original aggressor and clearly his acts constituted criminal conduct perhaps more serious in the eyes of the law than the charge of which he was convicted. However, in applying the statutory law of self-defense and the tests repeated in *Schwamb v. State, supra,* we are of the opinion that a new trial should be granted in the interest of justice. A careful reading of the entire transcript [1] raises a serious doubt as to whether the defendant Banks was lawfully exercising a right of self-defense at the time he shot at Kyles. If Kyles did fire the first shot, which seems to be well established, and even though Banks was the initial aggressor, Banks was entitled to a full consideration of

[1] The trial court undoubtedly did not have this aid. Also the trial court's task in evaluating the testimony was made much more difficult by reason of the fact that necessary adjournments necessitated hearing the testimony at three different intervals and over a period of several weeks, with the trial of many cases intervening.

the factual issue of withdrawal and notice. The record does not reveal that this determination was made. Under the facts of this case, in the interest of justice, pursuant to sec. 251.09, Stats., a new trial should be ordered.

*By the Court.*—Judgment and order reversed and a new trial ordered; defendant remanded to the custody of the sheriff of Milwaukee county to be held subject to further order of the trial court.

ROBERT W. HANSEN (*dissenting*). In its opinion, the trial court said:

"But, as I assess credibility under the total factual situation exposed here, and there is some conflict of evidence—my resolution is that the facts here, as I interpret credibility, do not justify the exercise of the privilege of self-defense on the part of the defendant here. . . ."

The reference in the opinion to "credibility" and "conflict of evidence," can refer only to the issue of who shot first, the tavern owner or the gun-toting defendant. There is no dispute as to the defendant coming into the tavern, armed with a gun; as to his ordering the tavern-keeper to turn over some money, which was handed over; or even as to his striking the tavern owner on the side of the head with the gun, all before the defendant started for the door.

The issue of credibility is as to the conflict of testimony as to who shot first. The tavern owner testified that he came from behind the bar, unarmed, saying, "Okay, buddy, you won't get far," and the defendant turned around and started shooting at the owner, a bullet striking the tavernkeeper in the abdomen. The defense testimony was that, after the defendant had secured the money at gunpoint, he was fired upon by the tavern-keeper, whereupon defendant turned around and fired back. The question of "credibility" and "conflict of

evidence" which the trial court assessed were resolved in favor of the state and against the defendant. Credibility and conflict are for the trier of fact to determine. (*State v. Christopher* (1969), 44 Wis. 2d 120, 127, 170 N. W. 2d 803.)

So the writer would affirm without reaching what the majority phrases as the issue of ". . . whether the defendant, the initial aggressor, regained the privilege of acting in self-defense by withdrawing from the conflict and giving adequate notice . . ." But on that question, the writer would make clear that an armed holdup man does not "withdraw from the conflict" when he begins his exit, still armed with a dangerous weapon, from the scene of the robbery. Here defendant's brief lists the defendant's turning around and facing the street with his back to the bar and opening the front door as indicia that the defendant "had, in good faith, withdrawn from the conflict." The brief asks, "what more effective way can a withdrawal be communicated than by a person's actions?" Actions can speak louder than words, but remaining armed with a dangerous weapon was an action too. Withdrawal means abandoning the enterprise, not leaving the scene. The "what more" that could have been done to demonstrate "withdrawal" would, at the least, have to include tossing away the gun and perhaps raising the hands overhead in the traditional arm position that indicates evident inability, as well as lack of intention, to threaten or inflict further harm. The bank or tavern robber who backs up or turns and heads for the door, gun in one hand, loot in the other, is not "withdrawing from the conflict." Rather, he is engaged in assuring its successful completion, and, while so engaged in a criminal enterprise, his role and rights do not change from that of an armed holdup man to that of a peaceful citizen on his way home from work.

More than a few steps, or their direction, are required to turn Mr. Hyde back to Dr. Jekyll.

I am authorized to state that Mr. Chief Justice E. HAROLD HALLOWS and Mr. Justice LEO B. HANLEY join in this dissent.