WATSON, Plaintiff in error, v. STATE, Defendant in error.

*No. State 157. Argued May 8, 1974.—Decided June 28, 1974.*
(Also reported in 219 N. W. 2d 398.)

For the plaintiff in error there was a brief by *Robert E. Sutton* and *Samson, Friebert, Sutton, Finerty & Burns,* all of Milwaukee, and oral argument by *Robert E. Sutton.*

For the defendant in error the cause was argued by *Michael R. Klos,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

HEFFERNAN, J. A number of errors are assigned. Among them is the claim that Watson was denied his right to a speedy trial under the Constitution of the United States and the Constitution of the state of Wisconsin.

The offense occurred in the early morning hours of September 23, 1969, when the home of Robert and Edith Guzinski was entered by a burglar. The burglar entered Edith Guzinski's bedroom, jumped on her back, and attempted to tie her up. There was no proof of any attempt at sexual molestation. It was still dark, and the victim never was able to see her assailant.

When he attempted to tie her up with a rope, she bit his thumb, drawing blood. When she continued to struggle, he threatened her with an instrument that she described as being not very sharp, about two and one-half inches wide, with a four to six inch handle. He struck her on the head about three or four times. The noise awakened her children. She called to them to go next door for help. At this point, the intruder abandoned his attack and left the house.

The assailant was loquacious, and during the entire ten or fifteen minutes he was in the bedroom, he kept up a running conversation. At trial, the victim testified that his speech "sounded like a Negro, male." No objection was made to this testimony. She also testified that, in the course of the struggle, she brushed against his face and concluded that he wore a goatee.

Despite the fact that this attack occurred on September 23, 1969, a criminal complaint was not issued until July 13, 1971. During this interim, however, suspicion was focused upon the defendant. The record shows that

on October 3, 1969, a warrant-authorized search of the defendant's car was made, and on April 14, 1971, a sample of the defendant's blood was obtained.

During this period, at least from April 13, 1971, to the time of the verdict, defendant was incarcerated in the Wisconsin State Prison at Waupun serving a sentence on another charge.

Despite the issuance of the complaint on July 13, 1971, the case was not brought to trial until December 12, 1972, a period of seventeen months. It is claimed that the delay was excessive and denied Watson his constitutional right to a speedy trial.

In *Barker v. Wingo* (1972), 407 U. S. 514, 530, 92 Sup. Ct. 2182, 33 L. Ed. 2d 101, the supreme court set standards to be applied on an ad hoc basis in determining questions of speedy trial.

The supreme court there said that four factors should be balanced in determining a possible violation of a defendant's right to a speedy trial. The court said:

"Though some might express them in. different ways, we identify four such factors: Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker, supra,* page 530.

"Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker, supra,* page 532.

In the recent case of *Day v. State* (1973), 61 Wis. 2d 236, 212 N. W. 2d 489, to conform with *Barker,* this court redefined this jurisdiction's standards in evaluating claims of a denial of a speedy trial.

We approach Watson's claim on the basis of the *Barker* standards, as adopted by *Day.*

A glance at the chronology of this case reveals a presumptively prejudicial delay.

The complaint was filed on July 13, 1971, but the case was not brought to trial until December 12, 1972, an interim of seventeen months.[1] Such inordinate delay is prima facie unreasonable and prejudicial; but, as *Day*, page 245, points out, this prima facie showing merely triggers our inquiry and occasions our analysis of whether the excessive delay in fact resulted in prejudice.

We thus look to the reasons for the delay. They were summarized by the trial judge. He said:

"Whether the length of the delay is unreasonable, it seems that one should consider the conduct of the prosecution in this matter, and also of the defendant. Mere examination of the record, of course, and the above recital that the court made of the chronological events, indicates that many matters were filed for consideration, both by the defendant individually and through his attorney acting at the specific time. In regard to prosecution—there of course, is a lapse of time from the time of the alleged offense until the complaint was filed, but it did not appear to the undersigned that this is a matter to be considered in arriving at a decision whether the defendant has been denied a speedy trial. The very nature of the crime of which the defendant is charged has triggered some of the delay—it appears that the testimony taken at the preliminary examination covers 85 pages, and was not, and could not be made available to the defendant until December of 1971. Also the fact that the court accommodated the defendant's request for counsel and the resulting difficulty experienced with court appointed counsel, whether justified or unjustified, certainly caused some of the delay. Further, the inconsistent

[1] Argument is also made that the delay in charging Watson prejudicially denied him a speedy trial. However, we have been offered no substantial basis for that argument in the present case and do not consider it. We do not decide herein the question of whether there can be a denial of speedy trial where there has been a conscious decision by the state to delay the filing of the complaint.

motions of the defendant have caused some problem in that in one motion the defendant requests the court to appoint counsel, and in the same motion, requests a substitution of another judge. There is no question but what the defendant has previously asserted his right to a speedy trial, but at the same time, included other matters that, by the very nature of our court system, caused in itself, a delay. As an example, the undersigned was appointed by a document dated June 19th, 1972 but it was not until August 22nd, 1972 that counsel was actually appointed for the defendant, and certainly, the undersigned was not aware of any particular delay, but it is obvious that substitution both of counsel and of judges, does take some time."

While this statement capsulizes the trial judge's holding, we are not totally in accord with his conclusions. The record reveals substantial delays that must be charged to the state, not to the defendant. Watson's earliest motion for dismissal for want of a speedy trial was made on August 5, 1971. While this demand was without substantial merit at that time—it concerned precomplaint delays—the court failed to decide the motion until March 29, 1972, seven and one-half months later. A portion of that tardy decision concerned the question of probable cause for a bindover for trial. The transcript of the preliminary hearing was delayed at least four and one-half months. While this may explain, in part, the judge's failure to make an earlier decision, it does not exonerate the state, whose duty it was to supply a timely transcript. *Strunk v. United States* (1973), 412 U. S. 434, 436, 93 Sup. Ct. 2260, 37 L. Ed. 2d 56.

A further inspection of the chronology shows that on February 8, 1972, original counsel asked to be relieved. It was almost a month before the record shows any effort to act on this motion, and it was not until March 28, 1972, that new counsel was, in fact, appointed. In the interim, pro se motions were filed that apparently were

never acted upon. Even after counsel was appointed— counsel that this court knows to be well qualified—Watson persisted in pro se motions, insisted upon yet another counsel, and demanded a substitution of the trial judge. During this period Watson moved for various remedies, withdrew the motions, and then renewed them. In some respects, his motions were inconsistent, *i.e.*, he showed an unwillingness for the judge to act on his motions and yet renewed his demand for a speedy trial.

Finally, a substitution of judge was made on June 19, 1972. Thereafter, present counsel was appointed, and the case proceeded to trial without greatly excessive delay.

The apportionment of blame for this delay is difficult to assess, but we conclude that, of the seventeen months before the case came to trial, the state's failure to proceed with expedition accounts for approximately eight months of the delay. Delay after March of 1972 must be largely attributed to the defendant. We conclude, therefore, that an excessive delay, a delay of eight months that has not been reasonably explained, must be attributed to the state. If this delay has prejudiced the defendant, we are obliged, in accordance with *Barker* and *Day, supra,* to reverse and dismiss the charges.

The record shows that Watson fully complied with the rule that requires that he assert or demand his right to a speedy trial. We cannot conclude, however, that the events here show prejudice to the defendant under the standards of *Barker*. The failure of the state did not result in "oppressive pretrial incarceration," since Watson was in confinement at the state prison during the entire period as the result of a conviction on a prior charge and not as a consequence of the instant charge.

In the instant case, only one witness was called by the defense, a scientific expert whose testimony was not affected by the delay. The merits of the defense case were in no way impaired by failure to hold the trial at an earlier date.

As an element of prejudice, the *Barker* court spoke of the desirability of speedy trial to minimize the defendant's pretrial anxiety and concern over the outcome of the case. Acknowledging that this would weigh upon the mind of the ordinary man, whether he was confined as the result of inability to post bail on the particular charge or whether he was otherwise confined, as was Watson, we conclude that this element alone is not sufficient, at least in this case, to hold that the delay was prejudicial to the defendant. Watson was not denied the right of speedy trial under the terms of *Barker*.

At the time of the burglary and battery, Edith Guzinski was unable to see her assailant, but stated that he wore a goatee and spoke in accents that she described as being that of a Negro male. An examination of the bed on which the assault took place revealed a hair that was identified as that of a Negro male with blood type B. Moreover, June Browne, a witness for the state, identified the hair as being that from the body of a particular person—John Watson.

The defendant contends that such testimony should have been excluded, because the present state of the science of identification does not accept the proposition that hair samples can be determined to have come from a particular individual. It is argued that no authority on identification, with the exception of June Browne, asserts that such particularized identification can be made.

This question is ruled by *State v. Hunt* (1972), 53 Wis. 2d 734, 749, 193 N. W. 2d 858. In that case, June Browne was also a witness for the state. She testified that cat hairs found on the defendant's jacket were hairs from an animal owned by the victim. On appeal, it was argued that the state of the art of scientific identification did not accept the proposition that such a positive and particularized identification could be made. We said, however, in *Hunt:*

"If the witnesses overstepped their bounds in testifying that a particular hair came from a particular cat or person, their testimony was subject to impeachment in the eyes of the jury." (P. 749)

In the instant case, as in *Hunt*, the defendant had the opportunity to present other evidence that would tend to show that June Browne was out of step with recognized authorities in the art of scientific identification. In this state, we follow the wide-open rule of cross-examination. *Boller v. Cofrances* (1969), 42 Wis. 2d 170, 184, 166 N. W. 2d 129. It would appear that the defendant had ample opportunity to test June Browne's credibility in the eyes of the jury.

Basically, Watson's counsel contends that the general acceptance standard must be used to admit expert scientific testimony. McCormick, *Evidence* (2d ed., hornbook series), sec. 203, p. 489, is critical of this rule and demonstrates that it has evolved from unsubstantiated dicta appearing in *Frye v. United States* (Ct. App. D. C. 1923), 293 Fed. 1013. McCormick, page 491, states:

" 'General scientific acceptance' is a proper condition for taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence. Any relevant conclusions which are supported by a qualified expert witness should be received unless there are other reasons for exclusion. Particularly, probative value may be overborne by the familiar dangers of prejudicing or misleading the jury, and undue consumption of time. If the courts used this approach, instead of repeating a supposed requirement of 'general acceptance' not elsewhere imposed, they would arrive at a practical way of utilizing the results of scientific advances."

In a footnote to the above-quoted paragraph, McCormick points out that a serious problem is posed at the time of the trial judge's determination that the expert is "qualified." In the instant case, however, there was no challenge to June Browne's qualifications as an expert witness. That question is not before us on this appeal.

We conclude, therefore, that the identification of the chin hair was a matter of expert testimony that could be challenged by cross-examination or by impeaching evidence, either from other experts or from treatises. If, however, the witness is qualified as an expert, the testimony may be believed by the jury despite scientific evidence to the contrary. The question is one of credibility to be resolved by the jury.

Counsel for Watson contends that, if the identification of Watson's chin hair is excluded, the evidence is insufficient to support a conviction. As set forth above, we do not exclude that testimony.

Additional evidence was admissible and highly probative of guilt. In the instant case, the piece of rope that the assailant used to attempt to tie up the victim was identified as being consistent in all respects with a rope found in Watson's car.

Blood samples taken from the rope that was used in the attempt on the victim were consistent with samples of Watson's blood. Paint specks that were found on a watch left by the assailant were consistent with paint samples taken from a spray gun and a paint can found in Watson's car.

Thus, the paint, blood, rope, and hair were identified as being identical in nature to samples taken from Watson or from items in his possession and control.

Nevertheless, Watson argues that the evidence is insufficient. Counsel contends that the situation here is similar to that in *State ex rel. Kanieski v. Gagnon* (1972), 54 Wis. 2d 108, 194 N. W. 2d 808.

In that case, circumstantial evidence arguably tied the defendant to the crime—pubic hair at the scene, rope samples showing fibers consistent with those in Kanieski's trousers, dog hairs, and other materials. Yet, this court said:

"The direct evidence simply did not have enough probative value to convict this defendant. The testimony of the state crime laboratory's technician saying that the items 'could have had a common source' with the defendant or his clothing did not sufficiently establish a tie-in so that the jury could have concluded therefrom that the defendant committed the alleged crime." (P. 115)

The *Kanieski* rationale is not appropriate here. In *Kanieski,* it was undisputed that Kanieski had been on the premises on numerous occasions. Each of the items of evidence that the state argued were probative of guilt were explainable by the fact that Kanieski was a frequenter of the tavern. The allegedly circumstantial evidence of guilt did not exclude every reasonable hypothesis of innocence. In fact, all of the evidence could well have been generated by innocent conduct. In *Kanieski,* the circumstantial evidence, while probative of guilt, did not exclude a strong inference that the evidence was the result of completely guiltless conduct.

Here, however, the evidence was undisputed that Watson had never before been in the Guzinski house. Accordingly, the hair could not have been left on the bed under circumstances consistent with innocence. The same is true with respect to the rope, the paint, and the blood. These factors taken together form a strong and convincing web of circumstantial evidence pointing to guilt.

We said in *State v. Shaw* (1973), 58 Wis. 2d 25, 28, 29, 205 N. W. 2d 132:

"The test on appeal of the sufficiency of the evidence to convict is whether the evidence adduced, entitled to belief, and rationally considered by a jury was sufficient to prove the defendant's guilt beyond a reasonable doubt. . . . The test is not whether this court is convinced of the defendant's guilt but whether the jury acting reasonably could be so convinced. . . .

"The evidence does not have to remove every possibility before a conviction can be sustained. . . . The test stated in *State v. Johnson* (1960), 11 Wis. 2d 130, 136, 104

N. W. 2d 379, is 'that all the facts necessary to warrant a conviction on circumstantial evidence must be consistent with each other and with the main fact sought to be proved and the circumstances taken together must be of a conclusive nature leading on the whole to a satisfactory conclusion and producing in effect a reasonable and moral certainty that the accused and no other person committed the offense charged.' The circumstantial evidence must, however, be sufficiently strong to exclude every reasonable theory of innocence, that is, the evidence must be inconsistent with any reasonable hypothesis of innocence. This is a question of probability, not possibility."

This evidence is inconsistent with any reasonable hypothesis of innocence. It is sufficient to sustain the finding of guilt beyond a reasonable doubt.

Counsel also argues that Watson was denied equal protection of the law, because he was denied the services of an investigator in preparing his defense. This court, consistent with its position since *Carpenter v. Dane County* (1859), 9 Wis. 249 (*274), has recognized the necessity for counsel in all serious criminal cases. We have never held, however, that a defendant is, as a matter of right, entitled to an investigator in addition to a counsel, who is presumed to have some investigatory expertise. In the event a fair trial cannot be had without one, it is, of course, within the discretion of a trial judge to authorize the hiring of an expert or an investigator to prepare for trial. But no showing of such necessity was made here that would convince us that the trial judge's refusal to appoint an investigator was an abuse of discretion.

It is also claimed that Watson was denied a fair trial because only his poverty prevented calling an expert witness to refute the testimony of June Browne that the hair found on the bed was from the defendant's beard. This claim is not supported by the record. Upon request, the trial court authorized the defense counsel to obligate the county in the sum of $350 to retain expert scientific wit-

nesses. The trial judge specifically stated that, if that sum proved insufficient, the defendant could move the court for an authorization to expend additional funds.

No request was made for any additional funds for that purpose until the trial was almost completed. The record shows that counsel knew in advance the nature of June Browne's testimony, yet he delayed asking for an authorization for additional expert witnesses until the trial was well under way. It was not an abuse of discretion for the trial judge to refuse to grant additional funds at the time the request was made.

It it also argued that, under the holding of *Griffin v. Illinois* (1956), 351 U. S. 12, 76 Sup. Ct. 585, 100 L. Ed. 891, it was error not to furnish the defendant with a transcript of the hearing on his motion to suppress evidence. We agree that the failure to do so constitutes error. However, on this appeal, we have not been given any reason why any information in that transcript is relevant. The defendant is entitled to a full transcript, and he cannot be foreclosed from arguing any prejudicial error at that hearing, simply because the state has not fulfilled its obligation to furnish one. Such failure, however, does not mandate a reversal. Since the subject matter of that hearing cannot be considered on this appeal because of the state's omission, we direct the state and the district attorney to forthwith supply the defendant with the requested transcript. In the event a claim of arguable constitutional error is made, it may be asserted in a postconviction proceeding under sec. 974.06, Stats., inasmuch as it could not be considered on this appeal.

Prosecutorial misconduct is also asserted. The record reveals that this case is no model of prosecutorial efficiency or judgment. Many delays referred to above are attributable only to the state's lack of diligence. Though there was a substantial lack of zeal in bringing the case

to trial, the errors complained of at trial appear to be the result of overzealousness.

It is claimed that instances of prosecutorial misconduct during the opening statement, during the trial, and during final argument warrant a reversal and a new trial.

During the opening statement, the district attorney, over the objection of defense counsel, told the jury that Watson, when first interrogated, refused to discuss the charges with the investigating detective. The defense attorney objected and moved for a mistrial. Nevertheless, the trial proceeded without defense counsel insisting on a ruling on his motion for a mistrial.

Three days later, the district attorney, while examining Detective Mulock, who attempted to interrogate Watson, compounded the error committed during his opening statement by asking him whether he had ever attempted to discuss the burglary with Watson.

There was a prompt and vigorous objection by defense counsel. After the jury was excused, defense counsel said he supposed he should ask the court to instruct the jury that neither the prosecutor's comment in his opening statement nor the evidence from Detective Mulock has any probative value and should not be considered by the jury in any way during deliberations. The court said it was improper to admit evidence of Watson's silence and it would not allow the prosecutor to proceed on that line. The defense attorney then said, "All right. I will propose an instruction then." The record fails to show that any instruction was ever proposed or given.

While *State v. Jackson* (1935), 219 Wis. 13, 21, 22, 261 N. W. 732, apparently put the burden on the court to supply a curative instruction, *Gaertner v. State* (1967), 35 Wis. 2d 159, 150 N. W. 2d 370, held that the duty to ask for and furnish such instruction was on counsel. *Gaertner* stated that, when a prosecutor injects an improper or prejudicial remark:

"The primary responsibility for trying a lawsuit and for objecting to such a remark and for requesting in-

structions to the jury to disregard the remark was upon trial [defense] counsel." (P. 169)

In the instant case, able and experienced defense counsel was fully cognizant of the seriousness of the district attorney's impropriety. Yet, after objecting and volunteering to furnish a corrective instruction, he failed to do so. Defense counsel was faced with a difficult choice. A corrective instruction would again call to the jury's attention the fact that Watson had refused to give a statement. Counsel chose not to furnish an admonitory instruction for the jury.

Had the trial judge at that point refused to put a proposed corrective instruction to the jury, we would hold that a mistrial should have been ordered. However, the trial judge did not refuse to so instruct the jury. The conference was terminated, with the apparent understanding that defense counsel would frame and request the instruction. When he failed to do so, it was reasonable for the trial judge not to instruct sua sponte, for defense counsel's conduct placed the decision in the realm of trial strategy.

Other claims of prosecutorial misconduct arise out of the district attorney's closing argument.

While portions of the transcript reveal questionable overzealousness on the part of the prosecutor, no objection was made until after the return of the verdict. We have repeatedly said that counsel cannot permit a case to go to a verdict and, then, for the first time make an objection to the conduct of oral argument. *State v. Cydzik* (1973), 60 Wis. 2d 683, 695, 211 N. W. 2d 421; *State v. Bailey* (1972), 54 Wis. 2d 679, 196 N. W. 2d 664. The objections to the closing argument raised after verdict cannot be considered on this appeal. They have been waived.

*By the Court.*—Judgment and order affirmed.