RUFF, Plaintiff in error, v. STATE, Defendant in error.

*No. State 104. Submitted under sec. (Rule) 251.54 November 1, 1974.—Decided November 26, 1974.*
(Also reported in 223 N. W. 2d 446.)

714

716

718

The cause was submitted for the plaintiff in error on the briefs of *Howard B. Eisenberg,* state public defender, and for the defendant in error on the brief of *Robert W. Warren,* attorney general, and *Christine M. Wiseman,* assistant attorney general.

ROBERT W. HANSEN, J. A number of issues are raised on this appeal and each will be considered, separately and individually.

*Sufficiency of complaint.* Was the complaint legally sufficient to establish probable cause? Defendant admits the sufficiency of the complaint to establish probable cause that the alleged crimes had been committed, but challenges the sufficiency to establish probable cause that the defendant committed the crimes. The part of the complaint which names the defendant is based upon statements made to police officers by the defendant's accomplices, Charles Flowers and Willie Payne. Such statements were hearsay, but a criminal complaint may be based on hearsay.[1] However, there must be something in the complaint, considered in its entirety and given a common sense reading, which shows why the information on which belief is based should be believed.[2] The attack here is on the inference of reliability as to information furnished by an accomplice or coparticipant in a criminal

[1] *State v. Knudson* (1971), 51 Wis. 2d 270, 274, 187 N. W. 2d 321.
[2] *Id.* at pages 274, 275.

undertaking. We have specifically held that when a participant in a crime admits his own participation and implicates another, an inference may be reasonably drawn that he is telling the truth.[3] As specifically, we have held that such admissions against one's interest are not inherently untrustworthy.[4] The complaint here sufficiently alleged both the commission of the crimes and their commission by the defendant. As this court held, in a near-identical situation, ". . . It is a reasonable inference that two individuals who implicate themselves as well as a third coparticipant in a crime are telling the truth. . . ."[5]

*Change of venue.* Was it prejudicial error for the trial court to deny defendant's motion for a change of venue? Defendant on two separate occasions moved for a change of venue, contending that a fair and impartial trial could not be held in Rock county. The question of change of venue rests in the sound discretion of the trial court.[6] It is only where the evidence elicited, properly considered, gives rise to a reasonable likelihood that a fair trial cannot be had, that this court will find an abuse of trial court discretion in failing to grant a change of venue.[7]

[3] *State ex rel. Evanow v. Seraphim* (1968), 40 Wis. 2d 223, 228, 161 N. W. 2d 369.

[4] *Id.* at page 228. *See also: Okrasinski v. State* (1971), 51 Wis. 2d 210, 216, 186 N. W. 2d 314.

[5] *Id.* at page 228, this court adding: ". . . That the self-implicators may be known criminals with long records does not destroy reasonableness of an inference of truthfulness. It would be too much to require that self-identified partners in a burglary be established to be pillars of the community or leaders in the scout movement before their admissions could be found to have the ring of truth. . . ." *See also: Laster v. State* (1973), 60 Wis. 2d 525, 534, 535, 211 N. W. 2d 13.

[6] *State ex rel. Hussong v. Froelich* (1974), 62 Wis. 2d 577, 591, 215 N. W. 2d 390.

[7] *Id.* at page 591. *Thomas v. State* (1972), 53 Wis. 2d 483, 491, 192 N. W. 2d 864; *McKissick v. State* (1971), 49 Wis. 2d 537, 545, 182 N. W. 2d 282.

A number of factors are relevant to an evaluation of the circumstances involved in a motion for change of venue. They include " '. . . [t]he inflammatory nature of the publicity; the degree to which the adverse publicity permeated the area from which the jury panel would be drawn; the timing and specificity of the publicity . . . .' " [8] In the case before us, the evidence introduced at the hearings on the two motions for change of venue consisted of articles from the daily newspapers in Beloit and Janesville covering dates immediately after the commission of the crime, the apprehension of the defendant in another state, the guilty plea and sentencing of accomplice Payne, the guilty plea of accomplice Flowers, and defendant's preliminary examination. The record shows that the trial court read and considered the exhibits offered and concluded that the proof at the two hearings did not establish, under the test prescribed by this court, any "reasonable probability of prejudice inherent in the situation." [9] In our own evaluation of the nature, frequency, and timing of the allegedly prejudicial news material, we do not find it was inherently prejudicial to this defendant or that it created a reasonable probability that a fair trial could not be had in Rock county. We deal here with uneditorialized news of an informational nature which this court has held "may inform possible members of a jury, but . . . does not necessarily create prejudice." [10] We do not, and here cannot, consider the

[8] *Tucker v. State* (1973), 56 Wis. 2d 728, 733, 202 N. W. 2d 897, quoting *McKissick v. State, supra,* footnote 7, at page 545.

[9] *Thomas v. State, supra,* footnote 7, at page 491, this court holding: "The question then is not whether an actual demonstration of prejudice against Thomas was made, but rather whether the proof showed a reasonable probability of prejudice inherent in the situation. . . ."

[10] *Id.* at page 492, this court holding: "The type of news is important in the claim of potential prejudice. Uneditorialized news of purely informational nature may inform possible members of

factors listed in *Tucker* dealing with difficulties involved in striking a jury, extent to which jurors were familiar with the publicity, and defendant's utilization of challenges, peremptory and for cause, at the time of selection of jury.[11] Despite the statement by the trial court here that it would consider another motion for change of venue if made at the time of the jury selection, the defendant made no such motion, nor did defendant request that a record be made of the *voir dire* examination.[12] As to the evidence presented and the factors that could be considered by the trial court at the time of the motions for change of venue here made, we uphold the trial court finding that the circumstances here did not warrant or require granting defendant's motions for change of venue. Additionally, while not here needed or relied upon, we note that the nature of the verdict returned is a factor that may be considered.[13] Here the defendant seriously disputed at trial only the charge of first-degree murder, and the jury brought in a verdict of second-degree murder. The nature of the verdict returned further erodes the basis for here claiming that this jury was in any way prejudiced against this defendant.[14] We find no

a jury but such news does not necessarily create prejudice. An informed jury is not necessarily a prejudicial one. There is no claim here of editorialized news, of rabble rousing, or of an attempt to form public opinion . . . ."

[11] *Tucker v. State, supra,* footnote 8, at page 734.

[12] *See: State v. Woodington* (1966), 31 Wis. 2d 151, 168, fn. 2, 142 N. W. 2d 810, 143 N. W. 2d 753, this court there stating: "We are cognizant of the fact that usually a record is not made of the *voir dire* examinations. However, in this instance the appellant was well aware of his claim that an impartial jury could not be obtained by virtue of his own pretrial motion to dismiss on that ground. Under these circumstances we deem he should have made a record of all or a part of the *voir dire* to preserve his claim."

[13] *Tucker v. State, supra,* footnote 8, at page 734, quoting *McKissick v. State, supra,* footnote 7, at page 546.

[14] *Id.* at page 736, this court stating: ". . . The 'nature of the verdict returned' removes any basis that might otherwise exist

basis for concluding that the trial court here in any way abused its discretion in denying defendant's motions for change of venue.

*Request for investigator.* Was it error for the trial court to deny defendant's motion to have a county-paid investigator appointed for the defense? On the motion for the providing of such investigational assistance, with a defense claim that such appointment was "necessary" for the preparation of a defense, the trial court held that the record before it did not disclose sufficient basis for appointing an investigator, but that it would reconsider the motion upon a proper showing by the defendant. The motion was not renewed until after the trial. There is clearly no abuse of discretion here. We say here, as we said very recently in an analogous situation: ". . . We have never held, however, that a defendant is, as a matter of right, entitled to an investigator in addition to a counsel, who is presumed to have some investigatory expertise. In the event a fair trial cannot be had without one, it is, of course, within the discretion of a trial judge to authorize the hiring of an expert or an investigator to prepare for trial. But no showing of such necessity was made here that would convince us that the trial judge's refusal to appoint an investigator was an abuse of discretion." [15]

*Self-defense.* Was it prejudicial error for the trial court to refuse a self-defense instruction? Under the testimony of the eyewitnesses to the slaying, Mrs. Lila Trickie and her son, we have here no more than the gunning down of an intended robbery victim by an armed gunman. However, defendant claims that under the version of what occurred as given by him and his two accomplices, he was entitled to a jury instruction on

---

for claiming that this jury was in any way prejudiced against this defendant."

[15] *Watson v. State* (1974), 64 Wis. 2d 264, 276, 219 N. W. 2d 398.

self-defense, based on sec. 939.48, Stats.[16] The defendant requested the self-defense instruction. The trial court refused to include it on the ground that the record did not sufficiently raise the issue. Assuming that the defendant, with a .38-caliber revolver in his hand, confronted the victim with the announcement of an armed holdup, and that the intended robbery victim turned and shot twice at the stickup man, who then fired back to prevent himself from being killed, does sec. 939.48 create a right of self-defense then and there available to the armed robber? A recent decision of this court dealt with a dispute as to who had fired first where a holdup man, the robbery having been committed, was walking to the door of the tavern to leave the scene.[17] That case dealt with sec. 939.48 and ". . . the regaining of the privilege of self-defense by an aggressor. . . ."[18] It was there

---

[16] Sec. 939.48 (2) (a) and (b), Stats., providing: "Self-defense and defense of others. . . .

"(2) Provocation affects the privilege of self-defense as follows:

"(a) A person who engages in unlawful conduct of a type likely to provoke others to attack him and thereby does provoke an attack is not entitled to claim the privilege of self-defense against such attack, except when the attack which ensues is of a type causing him to reasonably believe that he is in imminent danger of death or great bodily harm. In such a case, he is privileged to act in self-defense, but he is not privileged to resort to the use of force intended or likely to cause death to his assailant unless he reasonably believes he has exhausted every other reasonable means to escape from or otherwise avoid death or great bodily harm at the hands of his assailant.

"(b) The privilege lost by provocation may be regained if the actor in good faith withdraws from the fight and gives adequate notice thereof to his assailant."

[17] *Banks v. State* (1971), 51 Wis. 2d 145, 186 N. W. 2d 250.

[18] *Id.* at page 156, this court stating: "Assuming that Kyles [the tavernkeeper and victim of the completed robbery] did fire the first shot, he would not have been justified in so doing because defendant *had been* engaged in unlawful conduct. *See:* Sec. 939.49, Stats.; 1 Wharton's, *Criminal Law* (12th ed.), p. 184, sec. 132. Nor would the fact that defendant *was fleeing* from the scene of

undisputed that the holdup man's back was turned and he was at the door of the tavern when the shooting started.[19] Given this situation of attempted withdrawal, the majority found the applicable rule to be: " '. . . If, however, after bringing on the difficulty, such a person withdraws, in good faith, and shows his adversary that he does not desire to continue the conflict, but his adversary thereupon pursues him and becomes the aggressor, he has the same right to defend himself as if he had not originally provoked the difficulty. . . .' " [20]

The situation of being one who " 'withdraws and gives his adversary reasonable ground for believing that he has withdrawn,' " [21] does not describe an armed gunman who has a .38-caliber revolver in hand and announces, "This is a stickup." Under his own testimony, defendant, armed with a deadly weapon, was moving toward the commission of a robbery, not away from it. He comes

---

his unlawful act have prevented him from regaining the privilege [of self-defense]." (Emphasis supplied.)

[19] *Id.* at page 158, this court noting: ". . . The four witnesses called by the defense all unequivocally testified that Banks [the defendant] had turned his back and walked toward the door and was opening or had reached the door when Kyles shot at him, and that this was the first shot. These were four disinterested witnesses, two of whom received gunshot wounds as a result of the incident."

[20] *Id.* at page 156, quoting Miller, *Criminal Law* (hornbook series), pp. 207, 208, sec. 67 (g), which section was also quoted as stating: " '. . . If he withdraws and gives his adversary reasonable ground for believing that he has withdrawn, it is sufficient. It is not required of him that he, at all hazards, make it actually known to his antagonist that he has withdrawn; if his acts are such as would notify a reasonable man under the circumstances of the withdrawal, that is all that is required of him. If the passion or cowardice of the adversary blind him to the actions of the accused showing his intention to withdraw, this cannot be charged against the accused, so as to deprive him of the right *secured by his withdrawal* to defend his life.' . . ." (Emphasis supplied.)

[21] *Id.* at page 156. *See,* footnote 20.

clearly under the rule set forth in *Banks* as applying to an armed holdup where withdrawal or attempted withdrawal is not at issue. That rule is, in *Banks*, stated to be: " '. . . self-defense is not available as a plea in excuse or justification, to one who was himself the aggressor in the difficulty which resulted in death or other injury. . . .' " [22] This is the common-law rule that one who himself brings on the necessity to take a person's life cannot claim self-defense in so doing. [23] A Wisconsin statute provides that ". . . [t]he common-law rules of criminal law not in conflict with the criminal code are preserved." [24] The right to regain the right of self-defense is not available to an armed gunman at the moment when he points his gun at an intended victim and announces, "This is a stickup." At that moment, the right of self-defense is on the part of the intended victim at whom the holdup man's gun is pointed, not on the side of the gunman commencing the stickup. [25]

This is not a situation where it could be contended that an aggressor retained a privilege of self-defense because the attack by the person attacked constituted an escala-

---

[22] *Id.* at page 156, quoting Miller, *Criminal Law* (hornbook series), *supra.*

[23] *See, e.g., Clifford v. State* (1883), 58 Wis. 477, 17 N. W. 304; 1 Wharton's, *Criminal Law and Procedure* (12th ed.), pp. 499, 500, sec. 228.

[24] Sec. 939.10, Stats.

[25] Sec. 939.48, Stats., providing: **"Self-defense and defense of others.**

"(1) A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what he reasonably believes to be an unlawful interference with his person by such other person. The actor may intentionally use only such force or threat thereof as he reasonably believes is necessary to prevent or terminate the interference. He may not intentionally use force which is intended or likely to cause death or great bodily harm unless he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

tion of the affray beyond that which would be legally justifiable in view of the nature of the original provocation. In such situation, the victim, resorting to a deadly force which was not a justifiable exercise of the right of self-defense, would, by the unwarranted escalation, himself become the aggressor in fact. In such situation, not present here, sec. 939.48 (2) (a), Stats., would appear to give such initial provoker of the difficulty the right to defend himself, assuming there was no reasonable means available to escape or otherwise avoid the escalated attack. In the case before us, the nature of the initial provocation—*i.e.*, the gun-in-hand confrontation of an intended victim by a self-identified armed robber—justifies the use of force by the intended victim in the exercise of his right to self-defense.[26] That is the difference between the situation in *Banks,* and the situation clearly present in the case before us, as the *Banks* rule makes evident.[27] At the moment of his pointing the gun at his victim and announcing the stickup, the defendant here, even under his version of what happened, had no legally recognizable right of self-defense, and it was not error for the trial court to refuse to submit the self-defense instruction.

*Sentences imposed.* Did the trial court abuse its discretion in sentencing the defendant? Defendant contends that the trial court erred in imposing consecutive sentences because the three crimes involved were part of the same "criminal episode." The reference to a single "episode" comes from guidelines for the exercise of the sentencing power,[28] not adopted in this state,[29] but,

---

[26] *Id. See also:* 1 Wharton's, *Criminal Law and Procedure* (12th ed.), pp. 477, 478, sec. 217, and pp. 516, 517, sec. 237.

[27] *Banks v. State, supra,* footnote 17, at page 156.

[28] *See:* American Bar Association's *Standards Relating to Sentencing Alternatives and Procedures* (Approved Draft, 1968), Appendix C, p. 335, sec. 22 (the Model Sentencing Act). *But see:* ABA *Standards, supra,* page 171, sec. 3.4 (a), leaving the question

even in a comment to the American Bar Association suggested standards, we find the reference to a "criminal episode" to relate to the situation where a defendant is charged with multiple crimes for just one act, and not to where different acts have resulted in multiple charges, one for each act.[30] Defendant's contention that he is being punished three times for carrying a weapon on the night in question will not hold water. He was convicted and sentenced for three acts: (1) Committing a burglary; (2) attempting a robbery; and (3) accomplishing a murder. It is not the carrying of a weapon, but the three uses to which he put the gun that are involved in the convictions.

Defendant further contends that the trial court failed to state its reasons for imposing the particular sentences. Stated reasons are required (1) to aid in appellate review, and (2) to facilitate the trial court's rationale of its sentences.[31] In the case before us, at the time of sentencing, the record makes clear that the trial court gave consideration to all of the inputs available: the arguments of counsel, the presentence report, the testimony of the witnesses, including that of the defendant, and the verdict of the jury. At the hearing on the motion for review of sentences, the trial court made clear the entirely valid reasons considered in arriving at the sentences, *i.e.*, the seriousness of the offenses, the defendant's attitude and lack of remorse, the circumstances surrounding the offenses, and the defendant's extensive prior criminal record.[32] To find an abuse of discretion in a sentence

---

of consecutive versus concurrent sentences to the discretion of the trial court.

[29] *McCleary v. State* (1971), 49 Wis. 2d 263, 290, 182 N. W. 2d 512, this court stating: "We adopt none of these Standards relating to length of sentence . . . ."

[30] Comment *b* to sec. 3.4 (a), p. 175, ABA *Standards, supra.*

[31] *McCleary v. State, supra,* footnote 29, at page 282.

[32] *See: State v. Tew* (1972), 54 Wis. 2d 361, 367, 368, 195 N. W. 2d 615, listing some of the factors this court has recognized as

imposed, there is in this state " '. . . the requirement that the complainant must show some unreasonable or unjustifiable basis in the record for the sentence complained of.' " [33] There is no such unreasonable or unjustifiable basis in this record. The gravity of the offenses and the extensive criminal record of this defendant [34] alone warrant the sentences imposed. The trial court did not abuse its discretion in imposing the sentences it chose, and it was not required to tailor or limit such sentences to those found appropriate in the cases involving accomplices Flowers and Payne.[35] Under sufficiently aggravated circumstances, a maximum sentence can be im-

properly considered in sentencing: ". . . A past record of criminal offenses . . . . a history of undesirable behavior patterns . . . . the defendant's personality, character and social traits . . . . the results of a presentence investigation . . . . the vicious or aggravated nature of the crime . . . . the degree of the defendant's culpability . . . . the defendant's demeanor at trial . . . . the defendant's age, educational background and employment record . . . . the defendant's remorse, repentance and cooperativeness . . . . the defendant's need for close rehabilitative control . . . . and the rights of the public," and adding, ". . . the length of pretrial detention."

[33] *Voigt v. State* (1973), 61 Wis. 2d 17, 23, 211 N. W. 2d 445, quoting *Jung v. State* (1966), 32 Wis. 2d 541, 548, 145 N. W. 2d 684. *See also: Lange v. State* (1972), 54 Wis. 2d 569, 196 N. W. 2d 680; *State v. Morales* (1971), 51 Wis. 2d 650, 187 N. W. 2d 841.

[34] This defendant's prior criminal record shows a ten-year history of criminal activity, including seven theft charges, two burglary charges, charges of shoplifting, disorderly conduct, carrying a concealed weapon, and possession and manufacture of a fire bomb. Further, the record indicates that, at the time of the commission of the crimes here involved, the defendant was on parole supervision and had had a previous probation revoked.

[35] *Buckner v. State* (1972), 56 Wis. 2d 539, 552, 202 N. W. 2d 406, this court stating: "The gravity of this particular offense, committed in the course of committing another crime, sufficiently supports the sentence. That defendant received a greater sentence (on a more serious charge) than did Smith, the leader, is not a relevant consideration as it does 'not relate to the merits of the conviction.' " Citing *Jung v. State, supra*, footnote 33, at page 545.

posed,[36] and here the circumstances and factors relevant to sentencing make entirely appropriate the sentences imposed.

*By the Court.*—Judgment and order affirmed.

---

[36] *McCleary v. State, supra,* footnote 29, at page 290, this court holding: ". . . We wish to make it absolutely clear, however, that a trial judge, in an aggravated case and in the exercise of proper discretion, could impose a maximum ten-year sentence in a forgery case and that such discretion would be sustained by this court."