THOMAS, Plaintiff in error, v. STATE, Defendant in error.

*No. State 141. Argued December 2, 1971.—Decided January 4, 1972.*
(Also reported in 192 N. W. 2d 864.)

484

For the plaintiff in error there was a brief and oral argument by *Franklyn M. Gimbel* of Milwaukee.

For the defendant in error the cause was argued by *Richard J. Boyd,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

HALLOWS, C. J.   Whether an instruction on self-defense should have been given depends upon the evidence which presented two versions of the shooting.   Officer David Chiaverotti, a member of the vice squad of the

Milwaukee police department, testified he, acting upon a tip, had made a call to an address on West Nash Street in Milwaukee and was told by Pat Bardwell she would be available for the purpose of prostitution at that address for $20. He and his partner Officer Terence Datka proceeded to the address, both dressed in civilian clothes. Officer Chiaverotti gave Datka his gun before entering the house and told Datka he would throw something through a window when he wanted Datka to come to his assistance. After being let into the house by Linda Hogan, Chiaverotti went into a bedroom with Pat Bardwell. Chiaverotti removed his coat and shoes and placed $20 on the dresser. Miss Bardwell stepped into the adjoining bathroom and later emerged nude. Chiaverotti then showed her his badge and told her she was under arrest for prostitution. She attempted to break out of his grasp and yelled, "Linda, Linda, it's the man. I have been busted. Get Roosevelt." Chiaverotti then threw a small bottle from the dresser through the window to signal Datka.

Chiaverotti and Bardwell struggled into the adjoining kitchen and when he heard someone hurrying down the stairs he attempted to keep that person from forcing his way through the kitchen door. Chiaverotti yelled through the door that he was a police officer. Thomas and another man, however, forced their way through the door and into the kitchen. Chiaverotti lost hold of Pat Bardwell and she ran away. Thomas and the other man began to strike Chiaverotti with broom and mop handles. Chiaverotti knocked Thomas down and then ran to the front door, found it locked, and was trying to open it when Thomas approached from Chiaverotti's rear. Chiaverotti turned and saw Thomas standing about eight feet away with a pistol. Chiaverotti was told to stand where he was and was called an obscenity by Thomas. After a few seconds, Thomas extended the gun and fired,

hitting Chiaverotti in the abdomen. At this point, Datka kicked in the front door, breaking the frame and the glass, and Thomas ran to the back of the house while Datka fired two shots at him.

The story of Thomas and Bardwell is at variance with the version of the police. Pat Bardwell testified that within a month before the shooting, a "customer" of hers had pulled a gun on her, stole some fur coats, said he was a policeman and left. She told Thomas about the incident. Both of them testified that a few weeks before, someone had fired a shotgun through the front window of the house.

Pat Bardwell testified Chiaverotti never showed her his badge or otherwise identified himself as an officer. Thomas testified Linda did not yell anything about Pat being busted but yelled, "There is a man down there jumping on Pat." Thomas denied there was a struggle to get through the kitchen door or that Chiaverotti at any time identified himself as a police officer or showed his badge. Thomas claims that when he came down stairs Chiaverotti had his arm around Pat Bardwell's neck. According to Thomas, after the fight in the kitchen in which he was knocked down and Chiaverotti had run out of the room, he went to the front bedroom. While there he heard glass breaking. He then took a pistol from a drawer and approached the front door of the house. He saw Chiaverotti coming toward him. He testified he cocked the gun and it went off but he did not fire intentionally. He admitted he never saw Chiaverotti armed, denied he shouted any obscenity to him and he stated he had no intention to kill Chiaverotti.

At the close of the evidence, Thomas asked the court to give three instructions to the jury on self-defense: Wis J I—Criminal 800, 820, and 830, which the court refused.

The privilege of self-defense and of the defense of others is clearly set forth in sec. 939.48, Stats.[1] Force may be used against another to prevent or to terminate what one reasonably believes to be an unlawful interference with his person by such other person; but he may only use such force as he reasonably believes is necessary. Before force which is likely to cause death or great bodily harm can be used, one must reasonably believe that such force is necessary to prevent imminent death or great bodily harm to himself. A person is privileged to defend a third person on the same basis he is privileged to defend himself provided he reasonably believes the third person would be privileged to act in self-defense and his intervention is necessary for the protection of the third person.

Instruction Wis J I—Criminal, 800, is based on sec. 939.48 (1), Stats., and is applicable to situations involving the use of force less than that likely to cause death or great bodily harm in self-defense. Instruction Wis J I—Criminal, 820, is applicable to the defense of another person and is similar to Criminal 800 in respect to the

[1] "939.48 **Self-defense and defense of others.** (1) A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what he reasonably believes to be an unlawful interference with his person by such other person. The actor may intentionally use only such force or threat thereof as he reasonably believes is necessary to prevent or terminate the interference. He may not intentionally use force which is intended or likely to cause death or great bodily harm unless he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself. . . .

"(4) A person is privileged to defend a third person from real or apparent unlawful interference by another under the same conditions and by the same means as those under and by which he is privileged to defend himself from real or apparent unlawful interference, provided that he reasonably believes that the facts are such that the third person would be privileged to act in self-defense and that his intervention is necessary for the protection of the third person."

amount of force permitted. Thomas requested instruction Wis J I—Criminal, 830, which concerns the privilege to use force likely to cause death or great bodily harm in the defense of a third person and implements sec. 939.48 (4).

At the time of the shooting, Thomas was not defending Pat Bardwell nor was she under any threatened harm of imminent death or great bodily harm. She was not in danger of any harm. She had already left the lower flat and was out of the presence of Officer Chiaverotti who was unarmed. Thomas could not have reasonably believed he was then defending her. Thus instructions Nos. 820 and 830, the defense of a third person, are not applicable. Instruction No. 800 is not applicable because it is applicable to situations involving force less than that likely to cause death or great bodily harm in self-defense and the force Thomas was using was a loaded gun. Outside of a claim he did not know Chiaverotti was a policeman and thought this was another incident of Pat Bardwell being attacked by a "customer," Thomas' own testimony does not sustain self- or third-party defense. He stated he cocked the gun and it went off "someway." He stated repeatedly he did not try to kill Chiaverotti and did not fire intentionally. One exercising the privilege of self-defense intends to use force or to threaten force against another for the purpose of self-defense. Thomas' testimony, rather than sustaining his self-defense argument, sounds more like a defense of an unintentional or accidental shooting.

Thus the conflict in the testimony between the state witnesses and the accused on the issue of self-defense did not present a factual basis for the jury to consider. The testimony of Thomas and Bardwell was insufficient as a matter of law to raise the issue of self-defense for the jury, even crediting Thomas with a reasonable belief of a necessity to put up some defense. This is not a case

where the existence of the privilege of self-defense rests on credibility of the witnesses. *See Dillon v. State* (1909), 137 Wis. 655, 119 N. W. 352; *Banks v. State* (1971), 51 Wis. 2d 145, 186 N. W. 2d 250.

In rejecting the self-defense instruction, the court did submit to the jury a verdict of "endangering safety by conduct regardless of life." Sec. 941.30, Stats. This is an included crime of attempted first-degree murder. *State v. Melvin* (1970), 49 Wis. 2d 246, 181 N. W. 2d 490; *Holesome v. State* (1968), 40 Wis. 2d 95, 161 N. W. 2d 283. This instruction adequately covered what Thomas was legally entitled to on his testimony.

Prior to impaneling the jury, the defendant moved for a change of venue for the reason there was such a prejudicial climate of public opinion in ‚Milwaukee against black persons accused of shooting white policemen that Thomas, a black person accused of shooting a policeman, who was white, could not get a fair trial. The motion was made under sec. 971.22 (2), Stats., which provides a change of place of trial may be made by a motion in writing supported by an affidavit, which states evidentiary facts showing the nature of the prejudice alleged. It was claimed that a few days previous a trial was had in which three black men were accused of attempting the murder of a white policeman. This was known in Milwaukee as the "Black Panther Trial," which garnered a large amount of media coverage due to the nature of the case and to the political overtones attached to the Black Panther revolutionary movement. It was also claimed an article appeared in the evening newspaper on the day before in which the many varied aspects of the Black Panther case were reviewed and the jury panel from which the petit jury would be chosen was almost identical to that used in the Black Panther case.

The motion was denied but without prejudice to show on *voir dire* there was prejudice. Upon *voir dire*, 17 of the 19 jurors questioned by the defendant about their

knowledge of the news-media coverage of the Black Panther case stated they had read and seen the news coverage and some of them had read the analysis in the newspaper the previous day. Four of the jurors finally accepted had been jurors in the Black Panther case.

The state argues that all of the potential jurors questioned indicated they could fairly judge Thomas, there were no political overtones in the instant case, and there was no showing in fact the jury drawn was prejudicial. It is generally recognized the question of a change of venue rests in the sound discretion of a trial judge, *State v. Kramer* (1969), 45 Wis. 2d 20, 171 N. W. 2d 919; *Miller v. State* (1967), 35 Wis. 2d 777, 151 N. W. 2d 688; *State v. Laabs* (1968), 40 Wis. 2d 162, 161 N. W. 2d 249; *State v. Nutley* (1964), 24 Wis. 2d 527, 129 N. W. 2d 155; *Krueger v. State* (1920), 171 Wis. 566, 177 N. W. 917. But, this discretion is directed by the constitutional requirements that the defendant is entitled to a fair trial and a change of place of trial may be the only effective means to attain that end. While *voir dire* and a continuance are other means, they may not be effective. But *see State v. Woodington* (1966), 31 Wis. 2d 151, 142 N. W. 2d 810, 143 N. W. 2d 753; *McKissick v. State* (1971), 49 Wis. 2d 537, 182 N. W. 2d 282.

The trial court in exercising its discretion in denying the motion did not think there was prejudice and if it were wrong and a fair jury could not be obtained on *voir dire,* it would again entertain a motion for change of venue. This is the traditional manner of meeting this problem, but the Supreme Court of the United States has admonished not to give too much deference to the discretion of trial courts. *Sheppard v. Maxwell* (1966), 384 U. S. 333, 86 Sup. Ct. 1507, 16 L. Ed. 2d 600; *see also Estes v. Texas* (1965), 381 U. S. 532, 85 Sup. Ct. 1628, 14 L. Ed. 2d 543. The fact a jury was drawn is

not conclusive of the question whether the change of venue should have been granted. In theory and also in practice, a jury represents the community in which its members live. A juror's decision is subject to the judgment of his friends and neighbors and what they think is important in determining whether a fair trial can be had. The American Bar Association's *Standards Relating to Fair Trial and Free Press* (Approved Draft, 1968), provides in Standard 3.2 (c) (d), "A motion for change of venue or continuance shall be granted whenever it is determined that because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that in the absence of such relief, a fair trial cannot be had. . . . A showing of actual prejudice shall not be required. . . . If such a motion is permitted to be made, or if reconsideration or review of a prior denial is sought, after the jury has been selected, the fact that a jury satisfying prevailing standards of acceptability has been selected shall not be controlling if the record shows that the criterion for the granting of relief set forth in subsection (c) has been met."

The question then is not whether an actual demonstration of prejudice against Thomas was made, but rather whether the proof showed a reasonable probability of prejudice inherent in the situation. The probability of an unfair trial as the test is indicated in *Rideau v. Louisiana* (1963), 373 U. S. 723, 83 Sup. Ct. 1417, 10 L. Ed. 2d 663; *Sheppard v. Maxwell, supra.* In our own evaluation of the nature, frequency, and timing of the alleged prejudicial news material, we do not find it was inherently prejudicial to Thomas. There was no publicity concerning the facts of the Thomas case. Prejudice must be predicated solely on the ground Thomas was a black man accused of attempting to murder a white policeman because the Black Panther trial, in which convictions were found, involved black men attempting to murder

a white policeman. We have found no case where the publicity involving one case may spill over and prejudice an unrelated case because of similarity of some of the facts. We said in *McKissick* the fact the same panel has heard a case somewhat similar does not as a matter of law create potential prejudice. While it is true a jury panel spending sixty days in criminal jury work becomes somewhat skilled or at least more knowledgeable, we do not believe that as a matter of law the members of the panel therefore become biased in favor of the state or against the accused.

The type of news is important in the claim of potential prejudice. Uneditorialized news of purely informational nature may inform possible members of a jury but such news does not necessarily create prejudice. An informed jury is not necessarily a prejudicial one. There is no claim here of editorialized news, of rabble rousing, or of an attempt to form public opinion against black men who attempt to murder white policemen. There was no massive news coverage or daily repetition to excite the public. We think the evidence in this case was insufficient to require a change of venue.

*By the Court.*—Judgment affirmed.