GARCIA, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–70–CR. Argued May 4, 1976.—Decided June 14, 1976.*
(Also reported in 242 N. W. 2d 919.)

178

For the plaintiff in error there was a brief and oral argument by *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *Marguerite M. Moeller,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

DAY, J.  Alberto Garcia was found guilty of first-degree murder following a jury trial. The appeal presents three issues: (1) Was the evidence sufficient to sustain a first-degree murder conviction? (2) Did the evidence require the court to instruct the jury on requested lesser-included offenses? (3) Should the trial have been delayed because of certain pretrial publicity?

On the evening of February 28, 1974, Mr. Santiago Coronado was shot in the heart in the men's room of the Casa Alegre tavern located in Mount Pleasant, Racine county.  Expert testimony established that the bullet was fired at no greater distance than 24 inches.  At the trial the state was the only party presenting witnesses. Mr. Benito Gomez testified that he observed Coronado sitting at the bar talking with members of his family. Mr. Coronado consumed no alcoholic beverages.  The defendant, Mr. Alberto Garcia, had his head down on the bar "like he was sleeping drunk." Gomez heard the de-

fendant speaking in Spanish but could not understand him because of his intoxicated condition. Gomez saw no conversation take place between the decedent and the defendant and was not aware of any previous argument. Gomez did not see the decedent and the defendant enter the men's room but, at some point, he heard a shot and, shortly afterward, Coronado emerged with a hand on his chest saying, "esta bato [this guy] shot me." Gomez eased Coronado to the floor and then saw the defendant coming out of the men's room with his hand in his right pants pocket, standing unsteadily. No one else came out of the men's room. Gomez testified that two other men came up to Garcia and guided him out of the side door of the tavern.

Santiago Rodriguez, Coronado's uncle, had been sitting next to him at the bar between Coronado and Garcia, who was seated a few stools away. About midnight, according to Rodriguez, Garcia approached Coronado and said in Spanish, "I want to talk to you. Let's go to the bathroom." Although Rodriguez had also observed Garcia sleeping at the bar, he testified that Garcia's words were clear and normal. He watched the two men walk into the bathroom and testified that Garcia had no obvious difficulty in walking. Shortly afterwards, Rodriguez heard a shot and saw Coronado stagger out of the men's room. A few seconds later, Garcia emerged and left with another man, without staggering or stumbling. No one else came out of the men's room, according to Rodriguez.

Louis Villarreal, owner of the Casa Alegre, testified that he had never seen Coronado and Garcia talking to each other. He testified that the defendant tripped over Villarreal's chair on his way to the men's room. Villarreal observed nothing else until the shot and Coronado's appearance followed by Garcia who, after standing for a

minute, left with one other unidentified man. Villarreal also observed Garcia's right hand in his pants pocket. Enrique Cruz testified in a manner similar to that of Villarreal, adding that the man who accompanied Garcia out of the bar—who, in fact, "pushed" him out—was Garcia's brother. None of the witnesses testified to having seen a gun.

Testimony established that the men's room had two possible exits besides the regular door: a window which was painted or jammed shut such that an investigating police officer could not open it, and a door padlocked on the inside. Three live and one spent .22 calibre shells were found on the men's room floor.

The defendant Garcia was arrested at his home about an hour after the shooting. A box of .22 calibre shells was found on his dresser. A police witness testified that those shells were indistinguishable from those found in the Casa Alegre men's room; that is, they were rim-fired, .22 calibre, long rifle extra range, trademarked with an "S." The supervising police officer at the arrest testified that Garcia was highly intoxicated. Another officer who spoke Spanish described Garcia's appearance and demeanor as "normal." A third officer described his walk as "natural."

On this evidence, the state rested its case, and the defense presented no evidence.

The defense requested that questions be submitted to the jury concerning certain lesser-included offenses of first-degree murder, specifically: (1) homicide by intoxicated user of a firearm (sec. 940.09, Stats.) ;[1]

---

[1] "940.09 Homicide by intoxicated user of vehicle or firearm. Whoever by the negligent operation or handling of a vehicle, firearm or airgun and while under the influence of an intoxicant causes the death of another may be fined not more than $2,500 or imprisoned not more than 5 years or both. No person shall be convicted under this section except upon proof of causal negligence in addition to such operation or handling while under the influence of an intoxicant."

(2) homicide by negligent use of a weapon (sec. 940.08) ;[2] and (3) homicide by reckless conduct (sec. 940.06).[3] The trial court denied this request and submitted only a charge of first-degree murder[4] with an instruction on intoxication as the defense to that charge. The jury returned a verdict of guilty of first-degree murder.

*Sufficiency of the Evidence.*

■ ■ The first question is whether there was sufficient evidence by which the jury could find beyond a reasonable doubt that the defendant was guilty of the crime of first-degree murder:

---

[2] "**940.08 Homicide by negligent use of vehicle or weapon.** (1) Whoever causes the death of another human being by a high degree of negligence in the operation or handling of a vehicle, firearm, airgun, knife or bow and arrow may be fined not more than $1,000 or imprisoned not more than one year in county jail or both.

"(2) A high degree of negligence is conduct which demonstrates ordinary negligence to a high degree, consisting of an act which the person should realize creates a situation of unreasonable risk and high probability of death or great bodily harm to another."

[3] "**940.06 Homicide by reckless conduct.** (1) Whoever causes the death of another human being by reckless conduct may be fined not more than $2,500 or imprisoned not more than 5 years or both.

"(2) Reckless conduct consists of an act which creates a situation of unreasonable risk and high probability of death or great bodily harm to another and which demonstrates a conscious disregard for the safety of another and a willingness to take known chances of perpetrating an injury. It is intended that this definition embraces all of the elements of what was heretofore known as gross negligence in the criminal law of Wisconsin."

[4] "**940.01 First-degree murder.** (1) Whoever causes the death of another human being with intent to kill that person or another shall be sentenced to life imprisonment.

"(2) In this chapter 'intent to kill' means the mental purpose to take the life of another human being."

"[O]n appeal this court's review is limited to determining whether the evidence adduced, believed and rationally considered by a jury was sufficient to prove defendant's guilt beyond a reasonable doubt. Reversal is required only when the evidence considered most favorably to the state and the conviction is so insufficient in probative value and force that it can be said as a matter of law that no trier of facts acting reasonably could be convinced to that degree of certitude which the law defines as beyond a reasonable doubt." *State ex rel. Kanieski v. Gagnon* (1972), 54 Wis. 2d 108, 113, 194 N. W. 2d 808.

▇▇▇▇ The jury here was required to make two critical determinations. The first was whether Garcia shot Coronado; the second was whether he intended to kill him. Both of these determinations were based largely on circumstantial evidence. "A criminal conviction can stand based in whole or in part upon circumstantial evidence," *Bautista v. State* (1971), 53 Wis. 2d 218, 223, 191 N. W. 2d 725; *State v. Johnson* (1960), 11 Wis. 2d 130, 134, 135, 104 N. W. 2d 379. Inferences drawn from circumstantial evidence must be reasonable and not conjectural, *State ex rel. Kanieski v. Gagnon, supra.* The evidence must be sufficient to exclude from the realm of probability, as opposed to possibility, any theory of the defendant's innocence.[5]

---

[5] "The evidence does not have to remove every possibility before a conviction can be sustained. *See: State v. Eberhardt* (1968), 40 Wis. 2d 175, 161 N. W. 2d 287. The test stated in *State v. Johnson* (1960), 11 Wis. 2d 130, 136, 104 N. W. 2d 379, is 'that all the facts necessary to warrant a conviction on circumstantial evidence must be consistent with each other and with the main fact sought to be proved and the circumstances taken together must be of a conclusive nature leading on the whole to a satisfactory conclusion and producing in effect a reasonable and moral certainty that the accused and no other person committed the offense charged.' The circumstantial evidence must, however, be sufficiently strong to exclude every reasonable theory of innocence, that is, the evidence must be inconsistent with any reasonable

The circumstantial evidence here overwhelmingly supports the conclusion that Garcia did, in fact, shoot Coronado. It is clear beyond a reasonable doubt that only these two were in the men's room at the time of the shooting. The decedent made a dying declaration, "[This guy] shot me." This statement reasonably ruled out the possibility that the deceased shot himself either intentionally or accidentally during a struggle. There was no evidence that any struggle had taken place. The jury certainly was justified in finding beyond a reasonable doubt that the defendant shot the decedent.

The second necessary finding by the jury was that Garcia intended to kill Coronado. By its very nature, intent is always an elusive element, "rarely susceptible to proof by direct evidence." *Clark v. State* (1974), 62 Wis. 2d 194, 197, 214 N. W. 2d 450. The defendant's intent or state of mind can be inferred from the circumstances and from his acts:

"While intent is a state of mind, it is not to be determined apart from the actions of the person involved. The state of mind or intent may reasonably be ascertained from the acts and conduct of a defendant, and the inferences fairly deducible from the circumstances." *Jacobs v. State* (1971), 50 Wis. 2d 361, 365, 366, 184 N. W. 2d 113.

There is the presumption that one intends the natural and probable consequences of his acts. *State v. Cydzik* (1973), 60 Wis. 2d 683, 697, 211 N. W. 2d 421. In cases of first-degree murder, the fact that the defendant shot his victim in a vital part raises a presumption of intent. *Smith v. State* (1975), 69 Wis. 2d 297, 303, 304, 230 N. W. 2d 858.

---

hypothesis of innocence. This is a question of probability, not possibility." *State v. Shaw* (1973), 58 Wis. 2d 25, 29, 205 N. W. 2d 132, quoted in part in *Gilbertson v. State* (1975), 69 Wis. 2d 587, 596, 230 N. W. 2d 874.

■ ■ The only question in the present case is whether the evidence of Garcia's intoxication rebuts the presumption of intent flowing from his act of shooting Coronado in the heart. The defense of intoxication is recognized statutorily,[6] and is explained in *State v. Guiden* (1970), 46 Wis. 2d 328, 331, 174 N. W. 2d 488:

"The 'intoxicated or drugged condition' to which the statute refers is not the condition of alcohol-induced incandescence or being well-lit that lowers the threshold of inhibitions or stirs the impulse to criminal adventures. It is that degree of complete drunkenness which makes a person incapable of forming intent to perform an act or commit a crime. To be relieved from responsibility for criminal acts it is not enough for a defendant to establish that he was under the influence of intoxicating beverages. He must establish that degree of intoxication that means he was utterly incapable of forming the intent requisite to the commission of the crime charged."

*See also: Jones v. State* (1975), 69 Wis. 2d 337, 345, 346, 230 N. W. 2d 677; *see generally: Roberts v. State* (1969), 41 Wis. 2d 537, 164 N. W. 2d 525.

In the case of *State v. Nemoir* (1974), 62 Wis. 2d 206, 210, 214 N. W. 2d 297, a first-degree murder prosecution in which there was conflicting evidence concerning the defendant's state of intoxication, this court said:

"[Defendant] submits that the evidence establishes that he was intoxicated and could not have intended to kill the victim because he was intoxicated. There is dispute in the testimony as to whether defendant was intoxicated, and the resolving of that dispute was for the jury to determine, not for an appellate court. The ques-

---

[6] "939.42 **Intoxication.** An intoxicated or a drugged condition of the actor is a defense only if such condition:

"(1) Is involuntarily produced and renders the actor incapable of distinguishing between right and wrong in regard to the alleged criminal act at the time the act is committed; or

"(2) Negatives the existence of a state of mind essential to the crime."

tion for the trier of fact was not whether defendant had been drinking, and how much, but whether there was such degree of intoxication as 'negatives the existence of a state of mind essential to the crime.' In a first-degree murder case, intoxication is not a defense if defendant still possessed the requisite intent to kill."

In the present case there was evidence that Mr. Garcia was quite intoxicated. He was apparently sleeping at the bar at one point. One of the officers arresting him over an hour later testified that he was still drunk. He hesitated for some moments before leaving the bar after the shooting and appeared unsteady on his feet. The jury might have found that Mr. Garcia was incapable of forming the requisite intent. However, there was considerable evidence, on which the jury apparently relied, that Garcia was capable of intending to kill Coronado. There was testimony that he asked Coronado to accompany him to the men's room in language described as normal by the nearest witness, who also testified that Garcia's ability to walk was not obviously impaired. The evidence further showed that he was apparently capable of firing the gun in such a manner as to shoot the deceased, Coronado, in the heart. All of these facts support the jury's conclusion of an intent to kill.

*Lesser-Included Offenses.*

The second issue raised by the defendant is whether the evidence, even if sufficient to support a conviction for first-degree murder, required the submission to the jury of requested instructions concerning the lesser offenses of homicide by reckless conduct, homicide by negligent use of a weapon, and homicide by intoxicated user of a firearm.

The rule on instructions on lesser-included offenses was discussed recently in *Harris v. State* (1975), 68 Wis. 2d 436, 439, 440, 228 N. W. 2d 645, quoting

*State v. Anderson* (1971), 51 Wis. 2d 557, 560, 187 N. W. 2d 335, and *State v. Bergenthal* (1970), 47 Wis. 2d 668, 675, 178 N. W. 2d 16:

"The general rule for determining when instructions on lesser degrees of homicide should be submitted to the jury is:

" 'To justify submitting lesser degrees of homicide than that charged in the information, there must be a reasonable ground in the evidence for acquittal on the greater charge and for conviction on the lesser charge.'

"In *State v. Bergenthal* we further said:

" ' The key word in the rule is "reasonable." The rule does not suggest some near automatic inclusion of all lesser but included offenses as additional options to a jury. Only if "under a different, but reasonable view," the evidence is sufficient to establish guilt of the lower degree and also leave a reasonable doubt as to some particular element included in the higher degree but not the lower, should the lesser crime also be submitted to the jury.' "

There are, therefore, two relevant requirements for submission of a lesser-included offense: (1) reasonable grounds for acquittal on instructed offenses greater than that requested; (2) reasonable grounds for conviction on the lesser offense requested. The evidence should be viewed in the light most favorable to the defendant in determining whether these requirements are met. *Ross v. State* (1973), 61 Wis. 2d 160, 172, 211 N. W. 2d 827.

Assuming that the jury could have acquitted the defendant of first-degree murder on the basis of the defense of intoxication, we hold that, on this record, there is no evidence that Coronado's death resulted from Garcia's negligence or recklessness such as to justify a finding of guilty as to any of the three requested lesser offenses, all of which are variations on negligent homicide. There was no reasonable ground in the present case for finding the defendant guilty of any of the requested

lesser offenses, and the request for submission of such offenses was properly denied.[7]

*Pretrial Publicity.*

The third issue raised by the defense is the matter of pretrial publicity. The trial of this case was scheduled to commence on Monday, August 26, in Racine. On Sunday, August 18, the Racine Journal Times reported on its front page the acquittal of another defendant, one Benjamin Savaglio, who had been charged with first-degree murder. The article was purely informational; but alongside the article in a boxed column were the names and addresses of the jury that had acquitted Savaglio, and the names were printed in heavy type.

---

[7] The defendant cites the case of *Mullaney v. Wilbur* (1975), 421 U. S. 684, 95 Sup. Ct. 1881, 44 L. Ed. 2d 508. In that case, the Supreme Court declared unconstitutional a requirement under the law of Maine that, to justify a verdict of manslaughter rather than murder, the *defendant* prove by a "fair preponderance" of the evidence that he acted in the heat of passion. The court found that this procedure, under which the state benefited from a presumption of "malice aforethought" once intent was proven, violated the due process requirement that the state prove all elements of the crime charged, including malice aforethought, beyond a reasonable doubt. In *Mullaney*, the defendant claimed that he killed his victim in the heat of passion.

The present case is readily distinguishable. Here the state has carried its burden of proving Garcia's intent beyond a reasonable doubt; no burden of proving any of the elements of first-degree murder was shifted to Garcia. It is true that, once the state had made its case of first-degree murder, Garcia was required to show the possibility that the killing had been negligent (rather than intentional) if he wished instructions on lesser offenses involving the negligence element. This is obviously distinguishable from the *Mullaney* situation, where the state was not required to make its case before the defendant was required to show mitigating circumstances. It is not a denial of due process to require that the evidence show some reasonable ground for acquittal on the greater charge and conviction on lesser charge, before the lesser charge is submitted to the jury.

The defense moved to postpone the case until the October jury panel was chosen. At an August 23 hearing on this motion, the defense produced two of the jurors named in the newspaper, one of whom had received a presumably adverse letter (not included in the appeal record) and the other of whom stated that a member of his family had received a phone call on the subject. Both testified that the article was intimidating, although both stated that it would not have affected their decision. The defense also brought forward four members of the local bar to testify that such newspaper reporting was unprecedented and that, in their professional opinions, it would be difficult or impossible to secure an impartial jury immediately after the newspaper story had appeared. The trial court denied the motion to adjourn the trial, and stated that the issue could be properly raised again at the *voir dire*. The defense again moved to adjourn the trial on August 26, based on newspaper reports describing the August 23 hearing which quoted the judge as expressing his confidence in the jury system in spite of the publicity engendered by the earlier article. Evidence of a radio news report on the subject, which was not included in the appeal record, was also introduced. The trial court again denied the motion, citing sec. 270.17, Stats.[8]

On *voir dire*, defense counsel established that 21 of the 24 veniremen were aware of the Savaglio article. Four of the panel were excused when they stated that the article might affect their judgment. The rest stated that they did not fear any harassment; or they did not view the article as criticizing the jury; or that if there were a

[8] "270.17 Newspaper information does not disqualify. It shall be no cause of challenge to a juror that he may have obtained information of the matters at issue through newspapers or public journals, if he shall have received no bias or prejudice thereby; or that he is an inhabitant of or liable to pay taxes in a county interested in the action."

possibility of harassment it would not affect their judgment.

The usual case involves a request for a change of venue or for a continuance because of pretrial publicity relating to the crime with which the defendant is charged, or publicity about the defendant in connection with that crime. Another type of case involves publicity, closely related in time, concerning the type of crime with which the defendant is charged, rather than concerning the specific crime in which he is involved,[9] or inflammatory publicity concerning a trial involving a similar crime.[10]

Here we have an entirely different type of case, in that the newspaper publicity alleged to create an atmosphere in which a fair trial could not be had involves publishing the names and addresses of jurors, members of the panel under which the defendant is to be tried, who have acquitted another defendant charged with first-degree murder. The allegation is that the publicity given to such jurors is of a nature to intimidate other jurors and cause them to hesitate to acquit a defendant because of the fear of the publication of their names and addresses along with a news story reporting such acquittal, and the possibility of harassment by others who disagree with the jury verdict.

In weighing the possibility of prejudice, recognized factors are the inflammatory nature of the publicity, the extent to which it permeated the community and the jury panel, its timing, and the verdict returned. *Jones v. State* (1974), 66 Wis. 2d 105, 109, 223 N. W. 2d 889; *Thomas, supra,* footnote 11 at p. 492; *Ruff v. State* (1974), 65 Wis. 2d 713, 722, 223 N. W. 2d 446; *Tucker v. State* (1973), 56 Wis. 2d 728, 736, 202 N. W. 2d 897. In view of the facts of this case, including the testimony

[9] *State v. Spraggin* (1976), 71 Wis. 2d 604, 239 N. W. 2d 297.
[10] *Thomas v. State* (1972), 53 Wis. 2d 483, 489, 192 N. W. 2d 864.

of four attorneys, that printing of the names and addresses of jurors under these circumstances was an unprecedented action, we assume for purposes of discussion that the front-page identification of the Savaglio jury carried an implied criticism of them for their action. It is obvious that it reached most of the community, as 21 of the 24 veniremen were familiar with it, and that its timing, one week before the Garcia trial, was sufficiently proximate in time to raise a possibility of prejudice.

To justify a change of venue or continuance, the defendant need not show actual prejudice but only the "reasonable likelihood" of prejudice. *State v. Kramer* (1969), 45 Wis. 2d 20, 30, 171 N. W. 2d 919. However, there must be evidence, not merely allegations, that such a "reasonable likelihood" of prejudice exists. *State ex rel. Hussong v. Froehlich* (1974), 62 Wis. 2d 577, 593, 215 N. W. 2d 390.

When the issue of pretrial publicity is raised, as here, this court must make an independent evaluation not only of the publicity alleged to create the prejudice, but of the steps taken by the trial court to negate the prejudice.[11] Making such independent evaluation, it is the duty of this court to determine whether the trial court abused its discretion in refusing to grant a continuance.

An analysis of the trial court's conduct of the *voir dire* in this case convinces us that there was no abuse of discretion in refusing to grant a continuance. The record shows that the trial court encouraged exten-

---

[11] *Sheppard v. Maxwell* (1966), 384 U. S. 333, 86 Sup. Ct. 1507, 16 L. Ed. 2d 600. 384 U. S. at page 362:

"Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances."

sive inquiry by the defense counsel into the veniremen's attitudes, and excluded those four out of the 24 who expressed any possibility that the Savaglio report would affect their judgment. Many of those finally chosen saw no possibility of harassment by similar publicity and the rest affirmatively expressed their indifference to any possible harassment. Under some circumstances, it might be appropriate to disregard such expressions of indifference; if, for example, no jurors would admit to prejudice, it might be inferred that the prejudiced ones were afraid to expose what they regarded as a weakness. If the vast majority of veniremen admitted a prejudice, the fact that twelve could be found who stated they were not prejudiced would not necessarily support a refusal to grant a continuance or change of venue.[12]

We hold that the record fully supports the trial court's conclusion that the jurors were sincere in their expressions of impartiality and that a continuance of the trial under the circumstances was not necessary.[13]

*By the Court.*—Judgment and order affirmed.

[12] *Irvin v. Dowd* (1961), 366 U. S. 717, 81 Sup. Ct. 1639, 6 L. Ed. 751; *United States v. Chapin* (D. C. Cir. 1975), 515 Fed. 2d 1274, 1287–1289.

[13] This court has recognized the fact-finding power of the trial court in judging the sincerity of jurors on *voir dire*. *State v. Herrington* (1969), 41 Wis. 2d 757, 765, 165 N. W. 2d 120, citing with approval *State v. Nutley* (1964), 24 Wis. 2d 527, 546, 129 N. W. 2d 155.