COURT OF APPEALS
DECISION
DATED AND FILED

June 18, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2022AP1832-CR**

Cir. Ct. No. 2018CF3372

**STATE OF WISCONSIN**

**IN COURT OF APPEALS
DISTRICT I**

STATE OF WISCONSIN,

PLAINTIFF-APPELLANT,

V.

DEVON E. WORDS,

DEFENDANT-RESPONDENT.

APPEAL from an order of the circuit court for Milwaukee County: GLENN H. YAMAHIRO, Judge. *Reversed.*

Before White, C.J., Donald, P.J., and Geenen, J.

Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).

¶1     PER CURIAM.   The State of Wisconsin appeals the order granting Devon E. Words a new trial based on ineffective assistance of counsel.  A jury convicted Words of second-degree intentional homicide and possession of a firearm by an adjudicated delinquent for shooting an acquaintance during an argument.  Words moved for postconviction relief and a new trial based on ineffective assistance of counsel.  After a *Machner*[1] hearing, the postconviction court granted Words's motion.  We conclude that Words is not entitled to a new trial.  While we assume without deciding that trial counsel had instances of deficient performance, these errors did not prejudice Words's defense.  Under the totality of the circumstances, Words received a fair trial, and our confidence in the result is not undermined.  Therefore, we reverse the order granting Words a new trial.

**BACKGROUND**

¶2     According to the criminal complaint and trial testimony, Words shot Byron Burrows during a physical confrontation outside of a duplex in the 3100 block of North 92nd Street in Milwaukee on March 21, 2018.  Words was meeting the property owner and her real estate agent to discuss purchasing the property with his girlfriend, Michelle Brooks, who lived in the upper unit.  Brooks got into an argument with Deondra Brown, the tenant in the lower unit.  Words and Brown's boyfriend, Burrows, joined the women's altercation, which turned

---

[1] *State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).  The Honorable Janet C. Protasiewicz presided over pretrial proceedings, which included a relevant evidentiary ruling; we refer to Judge Protasiewicz as the circuit court.  The Honorable Joseph R. Wall presided over Words's jury trial; we refer to Judge Wall as the trial court.  The Honorable Glenn H. Yamahiro presided over Words's postconviction proceedings including the *Machner* hearing; we refer to Judge Yamahiro as the postconviction court.

physical and all parties spilled outside. According to the medical examiner's report, Burrows died of a single gunshot to the back of the neck.

¶3    In February 2019, Words filed a motion in limine requesting a pretrial ruling on the admissibility of a Facebook post allegedly written by Burrows: "Talking about giving her what she want naw... give it to me ... I want that smoke…. And we can clean take this shit off Facebook cause it clear we both know [where] the fuck to find each other."[2] Words argued that the Facebook post gave context to the dispute and that the reference to "smoke" in Burrows's post showed that Burrows wanted to get into a gun-aided confrontation with Words. In March 2019, the circuit court considered the Facebook post "very interesting" but wondered how it could be introduced when it was hearsay and how Words could establish a foundation that Burrows actually wrote it. The circuit court left the issue pending, and trial counsel informed the court he would review supportive case law.

¶4    The case proceeded to a jury trial in March 2020. Trial counsel, reviewing the motions in limine for the benefit of the trial court and the prosecutor, stated that the circuit court "excluded Facebook messages relating to Mr. Burrows on the grounds that the defense was unable to show that he had posted those messages. It's our understanding that the other messages are

---

[2] During postconviction proceedings, the State submitted a much longer version of the Facebook post at issue, which included over 100 comments on both Words's and Brown's Facebook profiles. When printed, the entire exchange was over thirty pages. The posts included comments from Words, Burrows, Brooks, Brown, as well as people not connected to the case.

admissible."[3] The prosecutor noted that Facebooks posts not written by Burrows might come in as evidence depending on the testimony, and trial counsel stated that he understood he would "need to lay foundation for the Facebook messages if they are introduced." The trial court concluded that any posts written by Burrows were excluded.

¶5 The State presented several witnesses who established the timeline of the shooting and Milwaukee Police Department (MPD) investigation. Both a neighbor and an off-duty MPD officer testified to hearing the shot and seeing a man laying on the ground, and seeing another man standing next to him before fleeing. The neighbor also testified that the standing man had a gun in his hand.

¶6 Brooks testified that she saw Words arrive at the property to meet with her, the property owner, and the real estate agent. She testified that she fought with Brown, and then Burrows walked up and slapped her in the face and hit her. Brown then grabbed her by the hair, and Burrows and Brown attacked her. She testified that she "saw [Burrows] pull the firearm out and point it at [Words] and [she] freaked out."

¶7 The property owner testified that she was meeting her real estate agent, Words, and Brooks to discuss selling the property. She testified about text messages between Brown and herself that focused on Brown's resistance to letting Words walk through her unit. She testified that she was in the kitchen when she

---

[3] The prosecutor, who had not been involved in the case when the circuit court addressed this motion in limine, noted that the court record entry "list[ed] this motion as being provisionally denied" and the previous assistant district attorney recorded it as denied in the case notes passed along to him. However, the record reflects that the motion was not denied, but that Words needed to establish a foundation and supportive legal authority to revisit the issue.

4

heard Brooks come down the stairs and then heard Brooks and Brown argue. She went outside when the altercation started. She saw Burrows hit Brooks. She recalled that Words told her to call 911 as the altercation spilled outside; she was on the phone with 911 when she heard the shot.

¶8 The real estate agent testified that he saw the physical altercation, heard the shot, and called 911. He testified that Brooks came downstairs and started screaming at Brown and Burrows, and then the property owner and Words arrived. The real estate agent tried to keep the factions separate, but then things got louder and he and the property owner went outside. When Brooks and Brown starting physically fighting, Words and Burrows spilled outside as well, punching each other in a "death struggle" without speaking. He saw Burrows on the ground, laying on his back, fighting with Words on top of him. He heard the shot while on the phone with 911. He watched Words run to his vehicle and drive away quickly.

¶9 Brown testified that Brooks had been aggressive in their verbal altercation. She testified she heard Burrows say, "[p]ut the gun down, fam." She saw that Burrows was on the ground and Words was behind him, but then Words stepped back from Burrows and shot him. Brown testified that she saw Words run upstairs after the shooting and Brooks ran after him, then he came downstairs and took off in his truck. Brown testified that she believed Burrows did not have a gun when he arrived that day because she hugged him and did not feel one, although she admitted she did not feel his pockets, jacket, or ankle.

¶10 An MPD detective testified that through police records and 911 phone records, the police ascertained that the shooting took place at 7:14 p.m., officers arrived on site by 7:18 p.m., and Words was no longer on the premises.

5

The detective testified there was an extensive search of the outside area where the shooting occurred and no casing or other ballistics evidence was found.

¶11    The medical examiner testified that the cause of Burrows's death "was complications of gunshot wound of the head and neck." She testified that a bullet entered at the back of his neck and exited at the top of his head. She opined that the cause of death was homicide because "[f]or a person to shoot themselves in the back of the neck at that angle isn't really physically possible[.]" She also testified that based on wound characteristics, the gunshot came at indeterminate range, meaning more than twelve to eighteen inches away. During cross-examination, trial counsel introduced an image of a hypothetical scenario of two men engaged in a wrestling altercation similar to Burrows and Words, with the man on top holding a firearm with the muzzle at least twelve inches away from the man on the bottom. The medical examiner testified that the position of the men would be a plausible scenario.

¶12    Words testified in his own defense. He testified that he arrived to a chaotic scene inside the building and he tried to calm everyone down. Words denied that he went upstairs before the physical confrontation. Words testified that while in the doorway, Brooks and Brown were "still going back and forth," then Burrows ran up to Words, yelling and pulling at his pants, and became physical with Words. Words testified that he turned and he saw Burrows with a "firearm in his waistband" and Words told the property owner to call 911. Words did not tell anyone about seeing the gun. Words testified that "[i]t happened so fast [but he] tried to avoid this at all cost[.]"

¶13    Words testified that Burrows was punching Brooks on the back, and Brown was pulling on Brooks's hair over the bannister. Then all four of them

tumbled out the front door. Words testified that Burrows pulled out the firearm and pointed it directly at his face, Words then reached his left hand out and grabbed Burrows on the right wrist, and they fell to the ground and wrestled for the gun. Words testified that he was "too close, [he] had no choice but to try to take [Burrows] down." Words heard a pop and he remembered not letting go of Burrow's wrist. Words then hopped up fast and he was in shock. He testified that he never got control of the gun away from Burrows, stating that his hand stayed on Burrows's wrist. Words then "freaked out" and left. Words took the gun when he fled and threw it in a garbage can near North 86th Street and Lisbon Avenue. He turned himself in about three and one-half weeks after the shooting.

¶14 The State showed Words the defense's image of two men struggling that the medical examiner reviewed and allowed was a plausible explanation of the body positioning of Burrows and Words during the incident. While Words acknowledged what the image showed, he could not say it was accurate because he did not "remember [what] happened … during the time … when we were struggling over the firearm." He testified that he looked around after the shot and heard Brown screaming. He picked up the gun because Brown came over to him.

¶15 The trial court instructed the jury on self-defense under the Wisconsin Criminal Code, reciting that Words would be "not guilty of any homicide offense if the defendant reasonably believed that he was preventing or terminating an unlawful interference with his person and reasonably believed that the force used was necessary to prevent imminent death or great bodily harm to himself." The court then instructed the jury on second-degree intentional homicide if imperfect self-defense applied, and first-degree intentional homicide "if the defendant caused the death of Byron Burrows with the intent to kill and did not actually believe the force used was necessary to prevent imminent death or

great bodily harm to himself." Finally the court also instructed the jury on first-degree and second-degree reckless homicide.

¶16 The jury returned a verdict of guilty on the lesser charge of second-degree intentional homicide and possession of a firearm by an adjudicated delinquent for an act that if committed by an adult would be a felony. The trial court imposed a sentence of twenty years, divided into thirteen years of initial confinement and seven years of extended supervision, imposed concurrently to the evenly bifurcated six year sentence on the firearm offense.

¶17 Words moved for postconviction relief on the basis of ineffective assistance of counsel, arguing that trial counsel should have presented the Facebook threat made by Burrows, and should have investigated Burrows for *McMorris* evidence of Burrows's character for violence and carrying a gun.[4]

¶18 The postconviction court granted Words a *Machner* hearing. The court heard testimony from trial counsel, Brooks, a childhood friend of Words, trial counsel's second attorney, and Words.

¶19 Trial counsel testified that this case was the only homicide he has tried. He included Words in every strategic decision in the case. On the issue of the Facebook post, trial counsel testified that he believed the circuit court had denied that motion in limine and he was surprised to learn that it had not been.

---

[4] *McMorris v. State*, 58 Wis. 2d 144, 205 N.W.2d 559 (1973). Under *McMorris*, when a defendant raises self defense to a homicide and "there is a factual basis to support such defense, the defendant may … establish what the defendant believed to be the turbulent and violent character of the victim by proving prior specific instances of violence within his knowledge at the time of the incident." *Id.* at 152. "*McMorris* allows the admission of opinion and reputation evidence and evidence of the victim's prior violent acts known to the defendant under limited circumstances." *State v. Daniels*, 160 Wis. 2d 85, 108, 465 N.W.2d 633 (1991).

Trial counsel stated that in light of his understanding that the circuit court had denied the motion in limine, he should have pursued additional ways to have the Facebook post admitted.

¶20     On the issue of *McMorris* evidence, trial counsel testified that he was aware that Words considered Burrows a "hothead," but he did not investigate whether there were witnesses to discuss Burrows's character and reputation for violence or habit of carrying a gun. Trial counsel testified that he knew that Words and Brooks believed Burrows had physically abused Brown, but he did not present a domestic violence expert. Trial counsel testified there was not a strategic decision to avoid investigating witnesses about Burrows's character for carrying a gun. Trial counsel believed that the criticism that he did not investigate Burrows for *McMorris* evidence of reputation for violence and his gun carrying was fair, and he believed this evidence would have aided Words's defense.

¶21     Trial counsel testified that he engaged an expert to create a scene reconstruction to explain how the shooting could have occurred with the bullet trajectory "with the two bodies together, as opposed to the State's theory with Words standing over him." Trial counsel testified that the defense maintained a self-defense theory throughout, although he admitted under the State's questioning that Words's testimony indicated that he did not agree that the image showed how the incident occurred.

¶22     Trial counsel's second chair attorney testified that there was not a strategic reason to avoid the Facebook post or to not pursue *McMorris* evidence.

¶23     Brooks testified that she discussed with trial counsel that she saw and heard instances of violence by Burrows against Brown. Tyrone Sanford, a childhood friend of Words, testified that he also knew Burrows because Burrows

coached Sanford's son's football team. He testified that Burrows was aggressive and that he saw Burrows carrying a gun at a kids' football game. Additionally, he testified about an incident several years ago in Myrtle Beach, when he, Words, and Brown were there for a motorcycle club event and Burrows "flew in" and then handled Brown aggressively.

¶24 Words testified that he felt threatened by the Facebook post because he perceived it as Burrows threatening to shoot him. Words recalled that on a day between the Facebook post and the shooting, he saw Burrows motion to him from Brown's front window observed that Burrows had a gun in his waistband. Words testified that in the Myrtle Beach incident, Burrows chased Brown on the beach and hit her. Words also recalled an incident the month before the shooting, when he observed Brown trying to exit the house and Burrows throwing her back inside. Words testified that he discussed these incidents with trial counsel and suggested that counsel hire an investigator.

¶25 The postconviction court issued an oral ruling in September 2022. The court listed deficiencies in trial counsel's performance: it was his first homicide case; he had no strategic reason for not hiring an investigator to pursue Burrows's previous incidents of violence and character for carrying a firearm; no strategic reason not to pursue the Facebook threat or *McMorris* evidence; and he misunderstood the circuit court's decision on the motion in limine. The postconviction court concluded that trial counsel's performance was deficient and that he admitted to it.

¶26 Turning to the prejudice prong, the postconviction court concluded that the jury's verdict of second-degree intentional homicide showed the jurors did not completely discount the self-defense defense. The court found that there was a

reasonable probability of a different outcome if the jury had heard the additional *McMorris* evidence. The court concluded that the cumulative effect of the missing information prejudiced Words's defense. The court vacated Words's judgment of conviction on both counts: second-degree intentional homicide and possession of a firearm by an adjudicated delinquent. The State appeals.

## DISCUSSION

¶27 The State argues that the postconviction court erred when it granted Words a new trial after concluding he received ineffective assistance of counsel.[5] The State argues that trial counsel's performance was not deficient and the claimed errors did not prejudice Words's defense because Words's trial testimony did not support that he was acting intentionally when he shot Burrows, a necessary element of self-defense. Therefore, the State contends that the additional information that Words felt threatened by Burrows and knew Burrow's reputation for violence and his habit of carrying a gun would not have affected the verdict.[6]

¶28 To succeed on a claim of ineffective assistance of counsel, the defendant must satisfy the two-prong test in *Strickland v. Washington*, 466 U.S. 668, 687 (1984): deficient performance and prejudice to the defense from that performance. To show deficient performance, "the defendant must show that

---

[5] The State also argues that the postconviction court erred when it vacated the count for the possession of a firearm by an adjudicated delinquent offense. Because we conclude that Words is not entitled to a new trial and reinstate his judgment of conviction, we do not address the State's separate arguments on this issue.

[6] Words proffers two sets of evidence that he argues should have been pursued: the Facebook post and the evidence of Burrows's reputation for violence and gun carrying. As the Facebook post also was intended to show that Words felt threatened by Burrows, we refer to the evidence generally as *McMorris* evidence for ease of reading.

counsel's representation fell below an objective standard of reasonableness." ***Id.*** at 688. To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ***Id.*** at 694.

¶29 A claim of ineffective assistance of counsel presents a mixed question of fact and law. ***State v. Carter***, 2010 WI 40, ¶ 19, 324 Wis. 2d 640, 782 N.W.2d 695. We will uphold findings of fact unless clearly erroneous. ***Id.*** "Findings of fact include the circumstances of the case and counsel's conduct and strategy." ***State v. Arrington***, 2022 WI 53, ¶34, 402 Wis. 2d 675, 976 N.W.2d 453, *cert. denied*, 143 S. Ct. 411 (2022). "Whether counsel's performance satisfies the constitutional standard for effective assistance of counsel is a question of law, which we independently review." ***Id.***

¶30 Although the State disputes that trial counsel's performance was deficient, trial counsel's ***Machner*** hearing testimony reflected a lack of reasonable strategy to explain some of the omissions in the investigation of Burrows's reputation, and the failure to pursue the foundational concerns about the Facebook post. We therefore assume without deciding that trial counsel's performance was deficient, and turn our attention to prejudice.

¶31 The State argues that Words's trial testimony undermined his case for self-defense, meaning that additional information about why Words had reason to believe Burrows presented an imminent threat would not have changed the outcome. Words disagrees, arguing that there was a reasonable probability of a different outcome if the ***McMorris*** evidence had been presented, such as changing

the jury's verdict from second-degree intentional homicide based on imperfect self-defense to an acquittal based on perfect self-defense.

¶32    The State argues that the postconviction court ignored Words's incredible testimony and that Words's testimony undermined a perfect self-defense theory.  For the privilege of perfect self-defense to apply, the jury would have to find that Words was intentionally acting to defend himself, reasonably believed that Burrows presented an actual or imminent unlawful interference with his person, and reasonably believed that the amount of force he used was necessary to prevent or terminate the interference.  *State v. Ruffin*, 2022 WI 34, ¶32, 401 Wis. 2d 619, 974 N.W.2d 432.  In this analysis, some of Words's testimony supports his self-defense theory, including "[i]t happened so fast [but he] tried to avoid this at all cost" and that he "had no choice but to try to take [Burrows] down."  However, his testimony for intentional action was lacking because he testified that he did not know what happened, he claimed he never let go of Burrows's wrist, and he claimed to never have had control over the gun.

¶33    Words contends that additional evidence would bolster Words's self-defense claim; however, that evidence would not overcome that Words testified he did not control the gun.  His trial testimony described the shooting more as an accident than an act of self-defense.[7]  At best, additional evidence of Burrows's

---

[7] An accident defense can co-exist with a self-defense theory when there is factual basis to support it.  *See State v. Gomaz*, 141 Wis. 2d 302, 313-14, 414 N.W.2d 626 (1987).  When a defendant, using a knife, intentionally threatened a person who had severely beaten her the day before and who was again coming at her, our supreme court concluded there was "one continuing act of self-defense" from the moment "she intentionally wielded and threatened the use of the knife, to the next instant, when she claimed that [the decedent] overtook her intentions by forcing himself upon her[.]"  *Id.* at 305, 313.  Unlike the testimony in *Gomaz*, Words's testimony does not show a "continuous act of self-defense."  *Id.*  Further, Words does not argue, much less make a showing, that trial counsel failed to pursue accident within self-defense or how that failure prejudiced his defense.

reputation for violence may have bolstered the reasonableness of Words's fear of an imminent threat, but it would have not bolstered the intentionality of his conduct. "One exercising the privilege of self-defense intends to use force or to threaten force against another for the purpose of self-defense." ***Thomas v. State***, 53 Wis. 2d 483, 488, 192 N.W.2d 864 (1972).

¶34 The State argues that the postconviction court focused only on trial counsel's failure to present additional evidence, without giving consideration to the totality of the evidence that was actually before the jury. ***Strickland***, 466 U.S. at 695. Our examination of the record shows substantial evidence that places Words at the crime scene, fighting with Burrows, holding the gun after the shot, and fleeing with the gun. There was also ample testimony about the conflict between Words, Brooks, Burrows, and Brown that day that showed it was chaotic and brutal; in the words of the real estate agent—Words and Burrows were engaged in a silent "death struggle." The record reflects ample support for the jury's verdict that this was a case of the use of unnecessary defensive force, which reflects imperfect self-defense. In the view of the totality of the evidence at trial, we conclude that Words has not met his burden to show that "the decision reached would reasonably likely have been different absent the errors" by trial counsel. ***Id.*** at 696.

¶35 Ultimately, we conclude that Words failed to show that the assumed deficiencies in trial counsel's performance prejudiced his defense to a degree that undermined confidence in the verdict. Therefore, he has failed to make a showing of prejudice. ***Id.*** at 694. A defendant must make a showing on both prongs in order for an ineffectiveness claim to succeed. ***Id.*** at 687.

**CONCLUSION**

¶36    After our independent review of the question of law of whether "counsel's performance satisfie[d] the constitutional standard for effective assistance of counsel," we conclude that Words's claim of ineffective assistance of counsel fails. *Arrington*, 402 Wis. 2d 675, ¶34. We therefore reverse the postconviction court's order vacating his conviction and we reinstate the judgment of conviction for both the homicide offense and the possession of a firearm by an adjudicated delinquent offense. Further, Words's sentence is reinstated.

*By the Court.*—Order reversed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2021-22).